[Crim. No. 2929.  In Bank.—June 9, 1927.]

# THE PEOPLE, Respondent, v. CHARLES SIEBER, Appellant.

[1] CRIMINAL LAW — MURDER—EVIDENCE—APPEAL.—In a prosecution for murder, the court must assume on appeal in favor of the verdict the existence of every fact which could have reasonably been deduced from the evidence, and, among them, that it was possible for the defendant to commit the crime in the manner charged; and the verdict of the jury, approved by the trial court on motion for a new trial, is conclusive on appeal, as it can be disturbed only when the court can say, as a matter of law, that there was no evidence to support it.

[2] ID.—IDENTITY OF DEFENDANT—CLOTHING WORN BY DEFENDANT—ADMISSIBILITY OF EVIDENCE.—In this prosecution for murder it is held that there was no error in admitting evidence concerning the identity of the defendant when seen near the home of the deceased on the day of the homicide and as to the indentity of a coat said to have been worn by the defendant on that occasion.

[3] ID.—REPUTATION OF DEFENDANT—CROSS-EXAMINATION.—In a prosecution for murder, in which a witness testified that the defendant had "a good reputation as a peaceful and law-abiding citizen," it was proper on cross-examination to ask the witness if he knew that defendant had lived with a woman who was not his wife, and had held her out to be his wife, as a character witness may be cross-examined as to his knowledge of reports of particular and specific charges of the commission of acts inconsistent with the trait of character (in this case that the appellant was a law-abiding citizen) which the witness was called upon to prove; nor could prejudice result to defendant from the asking of such question where it was answered in the negative, and the same fact was properly shown by other evidence, including that given by the defendant himself.

[4] ID.—FEAR OF DECEASED OF DEFENDANT—LACK OF ERROR AND MISCONDUCT OF DISTRICT ATTORNEY.—In a prosecution for murder no prejudicial error or misconduct can be assigned in the district attorney's asking a character witness for the defendant on cross-examination whether he knew that the deceased, during the last two years of her lifetime, feared that the defendant would kill her, and that she communicated her fear to her neighbors, where no objection was made to the question until it was answered in the negative and no motion was made to strike out the answer

1.  See 8 Cal. Jur. 582 et seq.
3.  See 27 Cal. Jur. 148.

and counsel did not request the court to instruct the jury to disregard the question but cited the action of the district attorney as misconduct.

[5] ID.—CLOTHING OF DEFENDANT—BURNING BY MOTHER—ERRONEOUS ADMISSION OF EVIDENCE—LACK OF PREJUDICE.—In a prosecution for murder, evidence offered by the prosecution to show that, after the defendant was arrested and while he was in jail awaiting trial, his mother burned and destroyed a brown sweater he was said to have worn, although inadmissible where it was not shown that defendant, if the sweater was his, wore it on the day of the homicide, and no attempt was made to connect it in any way with the commission of the offense, cannot be assigned as reversible error where there was no showing of prejudice.

[6] ID.—WITNESSES — REFRESHING MEMORY FROM STATEMENT — PRODUCTION OF STATEMENT—RIGHT OF ADVERSE PARTY TO EXAMINE—LACK OF PREJUDICIAL ERROR.—In a prosecution for murder, where the prosecution produced and showed a witness a phonographic report of a statement made by him, it was error for the court to refuse to order that defendant's counsel be allowed to examine the document, but the error was without prejudice, where the record shows that little more, if anything, could have been accomplished by the use of the statement and that defendant's counsel must have been well informed as to what the statement contained.

[7] ID. — DECLARATIONS OF DEFENDANT—FAILURE TO SUSTAIN OBJECTIONS TO.—In a prosecution for murder, where a fellow-prisoner of the defendant was permitted to testify to certain conversations between himself and the appellant, objection to the evidence cannot be considered on appeal, where it does not go beyond contending that the testimony was incompetent and not within the exception to the rule as being a declaration or admission against the defendant, and it has not been pointed out how, or in what manner, the evidence was inadmissible, or in what manner its admission tended to prejudice him.

[8] ID.—EVIDENCE—RES GESTAE—BLUE-PRINTS.—In a prosecution for murder, there was no error in allowing in evidence pieces of blue-print found near the body of the deceased, where there was evidence tending to connect the appellant with them, and it was shown that less than an hour before the killing appellant was seen with a roll of blue-prints in his hand which had been given to him by the witness in connection with their common employment, the witness recognizing the tracing on at least one of the pieces of blue-print found near the body and testifying that it looked somewhat like the map he had given to the appellant on that occasion.

[9] ID.—EVIDENCE—UNRESPONSIVE ANSWER—RIGHT TO STRIKE OUT.—
An objection that an answer is not responsive is one that can be
made only by the party who asked the question, if the answer
is otherwise admissible; but it is held in this case that the action
of the court in improperly striking out certain testimony on that
ground was not prejudicial to the appellant.

[10] ID.—WHEREABOUTS OF DEFENDANT AT TIME OF HOMICIDE — WIT-
NESS—CROSS-EXAMINATION — IMPEACHMENT.—In a prosecution for
murder, the actions and movements of the defendant during the
time he claimed to be at a certain place on the morning of the
homicide constituted a most material element in the case; and
where a witness for the prosecution testified that he and two
others in the crew working under the defendant had loaded a
truck at a certain place on the morning of the homicide, ques-
tions asked by defendant's counsel on cross-examination, in an
effort to show that the witness had previously told another that
the defendant helped to load the truck, was not an attempt to
impeach the witness on a collateral matter, but the exclusion of
such evidence is held not to have been prejudicial to defendant
in this case.

[11] ID.—ALLEGED MISCONDUCT OF COURT—FAILURE TO SHOW.—In this
prosecution for murder it is held that there is nothing shown in
the attitude or action of the court to warrant the feeling that
the defendant was prejudiced or prevented from having a fair and
impartial trial by the action of the trial judge.

[12] ID.—ALLEGED MISCONDUCT OF DISTRICT ATTORNEY—INSUFFICIENT
SHOWING.—The right of counsel to discuss the merits of a case,
both as to law and facts, is very wide, and he has the right to
state fully his views as to what the evidence shows and as to the
conclusion to be fairly drawn therefrom. The adverse party can-
not complain if the reasoning be faulty and the deductions illogi-
cal, as such matters are ultimately for the consideration of the
jury; and it is held in this prosecution for murder that the actions
and attitude of the deputy district attorney during the trial did
not constitute prejudicial misconduct.

[13] ID.—MISCONDUCT OF DISTRICT ATTORNEY—ASSIGNMENT—REQUEST
FOR INSTRUCTION—APPEAL.—The rule is that when a district
attorney is guilty of misconduct in the trial of a criminal case, it
is ordinarily the duty of counsel for the defendant promptly to
call the attention of the court thereto, and assign it as miscon-
duct, or request the court to instruct the jury to disregard it

---

9.   See 24 Cal. Jur. 779.

10.   See 2 R. C. L. 411; 24 Cal. Jur. 739.

11.   See 2 R. C. L. 438, 439.

Such assignments and requests are necessary as a foundation for a complaint on appeal.

---

(1) 17 C. J., p. 272, n. 46 New; 30 C. J., p. 310, n. 25.   (2) 30 C. J., p. 162, n. 73, p. 163, n. 19.   (3) 17 C. J., p. 315, n. 72, 77; 40 Cyc., p. 2497, n. 52, 53.   (4) 16 C. J., p. 874, n. 3; 17 C. J., p. 71, n. 47.   (5) 17 C. J., p. 275, n. 27.   (6) 17 C. J., p. 307, n. 44; 40 Cyc., p. 2463, n. 67, 68.   (7) 16 C. J., p. 930, n. 93; 17 C. J., p. 69, n. 38, p. 313, n. 48.   (8) 16 C. J., p. 573, n. 36.   (9) 16 C. J., p. 874, n. 96; 17 C. J., p. 333, n. 88; 30 C. J., p. 184, n. 90.   (10) 17 C. J., p. 313, n. 47.   (11) 17 C. J., p. 295, n. 63.   (12) 16 C. J., p. 896, n. 85, p. 897, n. 86.   (13) 17 C. J., p. 62, n. 94, p. 72, n. 62, p. 183, n. 59.

APPEAL from a judgment of the Superior Court of Los Angeles County and from an order denying a new trial. Edwin F. Hahn, Judge. Affirmed.

The facts are stated in the opinion of the court.

Cooper & Collings, John S. Cooper, Thomas Toomey, Hugh L. Dickson, O. V. Willson and Herman Greenschlag for Appellant.

U. S. Webb. Attorney-General, William F. Cleary, Deputy Attorney-General, Asa Keyes, District Attorney, and Tracy Chatfield Becker, Deputy District Attorney, for Respondent.

WASTE, C. J.—Charles Sieber was indicted by the grand jury of Los Angeles County for the murder of his wife, Minnie Sieber. The trial jury returned a verdict of murder in the first degree, without recommendation. After motion for a new trial made and denied, judgment of death was pronounced, and an appeal was taken to this court. Appellant's first contention is that the evidence is insufficient to sustain the verdict, for the reason that there is no evidence showing a motive, or tending to connect the defendant with the crime with which he was charged.

The appellant and his wife were married in 1912, and, within the ensuing year, a daughter was born to them. Shortly thereafter the parents separated, but resumed marital relations in 1914. In 1916 they again separated and never afterward lived together. Sieber enlisted in the United States Army during the World War, and soon after its close

went to live in Los Angeles, where he entered the service of the city as a bricklayer. Mrs. Sieber had also gone to Los Angeles to reside, and in 1924, apparently under some compulsion, appellant began to pay twenty-five dollars per month toward the support of his daughter. In November, 1925, Sieber instituted a divorce action against his wife. Mrs. Sieber filed an answer, and on January 7, 1926, early in the morning, Sieber was served with an order to show cause why he should not pay alimony and attorney's fees in the action. The evidence establishes the fact that Mrs. Sieber was murdered within five minutes after 9 o'clock on that day. The deceased lived at 512 Avenue 28, Los Angeles, with her daughter, who attended school, leaving home shortly before 9 o'clock in the morning. Mrs. Sieber worked as a janitress in an office building from 4 to 8 o'clock in the morning, and in the afternoon. Appellant had learned from the daughter, a few days before the murder was committed, of the time his wife returned home from work, and at what time the daughter went to school. On the morning in question, the girl left for school about twenty-five minutes to 9 o'clock, leaving her mother alive and alone in the house. Shortly after 3 o'clock in the afternoon she returned with two girl companions and found her mother dead. She had been beaten to death in a most fiendish manner with some "powerful instrument," wielded with terrific force. A dent made by some blunt instrument, and in which was a strand of hair, was found on the door of the room. It was not there when the daughter left for school in the morning. In the room in which the body was discovered there were found several scraps of blue-print, which were identified by witnesses as being parts of a blue-print for a certain sewer manhole, which had been constructed by the appellant.

While there were no eye-witnesses to the homicide, it is the theory of the prosecution that Sieber became angered on being served with the order to show cause in the divorce action and went immediately to the home of his wife and killed her in a most brutal fashion. The prosecution relies upon several series of circumstances established by the evidence, from any one of which, it argues, the jury was warranted in inferring that the appellant committed the crime with which he was charged. When the several series of circumstances

are considered together, the prosecution contends, the inference of appellant's guilt becomes well-nigh irresistible.

The claim that the evidence is legally insufficient to support the verdict is without foundation. The record discloses that, in the discharge of his duties, the appellant worked at and supervised the work of installing sewer manholes, which were constructed according to blue-print specifications furnished to him. His working crew consisted of three men. On the morning of January 7th, the day on which the decedent was killed, Sieber left his home, riding in his own Chevrolet automobile, and reported at the municipal yard shortly after 8 o'clock. Immediately on entering the yard he was handed the order to show cause procured by his wife in the divorce action. According to the testimony of the process-server, Sieber showed no anger when served with the order, but made a disparaging remark about his wife, and said he would "go to jail" before he paid her any alimony. A fellow-workman testified, however, that about that time Sieber, carrying a roll of blue-prints in his hand and looking at the ground, seemed excited and angry.

Sieber was last seen at the yard between 8:10 and 8:30 o'clock. About half-past 8 o'clock, his crew, having loaded a truck with brick, sand, and cement, left the corporation yard and went to the vicinity of 21st and Toberman Streets, where they arrived about half an hour after leaving the yard. Sieber was not there, but, according to the testimony of the workmen, arrived at the manhole about twenty-five minutes after 9 o'clock. Shortly before 9 o'clock, according to the testimony of a witness, Reendres, Sieber was seen walking on Avenue 28, near the residence of the decedent, about two and one-tenth miles from the municipal yard. A small automobile was parked in front of the adjoining lot. At 9 o'clock, Mrs. Chambers, a neighbor, left her home three doors away, and started for the carline. As she passed the house of the decedent she heard "four terrible screams," which appeared to be the screams of a woman, and "three or four terrible knocks," which the witness said sounded like someone kicking or hammering on the front door. Another witness testified to seeing Sieber and his mother, some time after 9 o'clock, in the backyard of Sieber's home, about a mile and a half from the scene of the homicide, with a long-handled shovel between them.

According to the testimony of the men comprising appellant's working crew, there was nothing unusual in his demeanor and appearance when he appeared at the manhole on 21st Street, about five miles from the scene of the killing, some time after 9 o'clock. Sieber testified he was sure he arrived earlier than at the time fixed by the men. After working in silence for a while, according to the testimony of the workmen, Sieber, without any apparent reason, looked up from the manhole and said: "If anything would happen to my wife they would sure get me." The divorce action brought by Sieber against his wife was the subject of conversation during the day, as it had been at other times. On previous occasions, Sieber had said, so the same witnesses testified, that he desired to get rid of his wife; that he hated her "bad enough [he] would kill her"; that he had been trying to get a divorce long enough and "now he was going to have it"; that he was going to marry a young girl sixteen or seventeen years old. At noon on the day of the homicide Sieber consulted his attorney concerning the divorce action, after which he told one of the workmen that he would "rot in jail" before he would pay alimony to his wife. The appellant was arrested at his home about 5 o'clock in the afternoon. When accosted by the arresting officers, who were not in uniform, he started to run. When caught and asked why he ran, he said: "I figured if you were policemen you would shoot me." The arresting officers did not tell him he was under arrest, nor why they wanted him, but, when a neighbor asked him if he could do anything for him or "bail him out," he replied that he did not think it was a case in which he could be bailed out, and that the officers would probably not let him talk to anyone. He was taken at once to the scene of the crime and into the room where the body of his wife lay on the floor. At first he said he did not recognize the deceased, but, when asked if it was not the body of his wife, he said it was. According to the testimony of one of the police officers, who was then present, the appellant was asked "if he had come down that morning and killed her and he said 'no.' . . . At first his knees trembled— his body lowered a little.. Then he wavered, then he stood straight up again."

We deem it unnecessary to say much more about the evidence. In addition to that which we have summarized, and

evidence of purported statements made by the defendant while in jail awaiting trial, many facts and circumstances, which it is not necessary here to detail, were brought out, all tending to support the theory of the prosecution. The appellant testified in his own behalf. He specifically denied having any connection with the homicide, and gave what appears from the record to be a clear account of his entire movements during the day in question. He denied making a number of the incriminating statements attributed to him, and explained others. There was evidence concerning the clothing worn by him on the day of the homicide, and the absence of blood on the clothes. Witnesses testified to the distance necessary to be traveled in going from point to point, material to the theory of both the prosecution and the defense.

[1] Appellant characterizes the theory of the prosecution as a "weird story," entitled to a place in fiction, and contends that it was humanly impossible for him to have traveled the necessary distances and to have done the things charged by the prosecution within the time specified. All questions arising from the situation pictured by the appellant were addressed to the consideration of the jury. We must assume in favor of the verdict the existence of every fact which it could have reasonably deduced from the evidence, and, among them, that it was possible for the defendant to commit the crime in the manner charged. The finding of the jury was approved by the trial court on motion for a new trial. The findings of court and jury are conclusive upon the subject and upon this court, as we may disturb a finding only when we can say, as a matter of law, that there was no evidence to support it. (*People* v. *Erno,* 195 Cal. 272 [232 Pac. 710].) This is not such a case. There was testimony that the general reputation of the appellant for peace and quiet was good, and other testimony, in rebuttal, that it was bad. Enough has been set forth to demonstrate that there was sufficient evidence to sustain the verdict, if it was believed by the jury to be true. In some respects the facts in this case are like those in *People* v. *Larson,* 167 Cal. 751 [141 Pac. 374], in which the court said: "While it is true that no living person saw the actual killing of deceased other than the perpetrator of the homicide, and that the evidence was entirely circumstantial, it is idle to assert that there was not

enough in the evidence to warrant the conclusion beyond all reasonable doubt on the part of the jurors that the defendant was guilty as charged.''

[2] Appellant contends that the trial court erred in admitting testimony of the witness, Reendres, concerning the identity of the appellant when seen near the home of the decedent on the day of the homicide, and as to his having been able to subsequently identify a coat said to have been worn by the appellant on that occasion. He contends that the prosecution was permitted to ''bolster up'' the testimony of the witness by showing that, on a prior occasion and at the police station, he had done the same thing. The record does not bear the construction placed upon it by appellant, and we find nothing objectionable in the evidence admitted.

[3] It is next contended by appellant that the court erred in permitting the district attorney to ask, and that the district attorney was guilty of serious misconduct in asking, certain questions in cross-examining Miles Gregory, one of the character witnesses for the defense. He had testified that the defendant had ''a good reputation as a peaceful law-abiding citizen,'' and on cross-examination was asked if he knew that Sieber had lived with a woman who was not his wife, and had held her out to be his wife, if he knew Mrs. Sieber, during the last two years of her lifetime, feared Sieber would kill her, and that she communicated her fear to her neighbors. Appellant contends that the purpose of asking the questions was an attempt to degrade the defendant by incompetent evidence and in an indirect manner. The first question asked was admissible under the rule that a character witness may be cross-examined as to his knowledge of reports of particular and specific charges of the commission of acts inconsistent with the trait or character (in this case that the appellant was a law-abiding citizen) which the witness was called upon to prove. (*People* v. *Hightower,* 65 Cal. App. 331, 340 [224 Pac. 110].) Furthermore, no prejudice resulted to the defendant, because the question was anwered in the negative, and the same fact was properly shown by other evidence, including that given by the defendant himself. [4] No objection was made to the question concerning the fear of the decedent, which was admittedly improper cross-examination, until it was answered, also in the negative. The objection was not made on that

ground, no motion was made to strike out the answer, and counsel did not request the court to instruct the jury to disregard the question, but cited the action of the district attorney as misconduct. The third question, which was likewise improper as asked by the district attorney, was objected to, and the objection was properly sustained. The court, of its own motion, instructed the jury, in effect, to disregard the question, and that it was not to assume anything as a fact because it might be implied in the questions which were asked but not answered.

[5] Another contention of the appellant is that the trial court erred in permitting the prosecution to show that, after the defendant was arrested and while he was in jail awaiting trial, Mrs. Sieber, his mother, burned and destroyed a brown sweater appellant was said to have worn. We are unable to perceive, from the record, on what theory the prosecution was allowed to introduce the evidence. It is not shown that the defendant, if the sweater were his, wore it on the day of the homicide, and no attempt was made to connect it in any way with the commission of the offense. The testimony should not have been offered or admitted, but, beyond saying that the admission of the evidence was erroneous and contrary to law, appellant has not shown that he was in any way prejudiced by the testimony.

[6] Appellant's next contention is that the trial court erred in refusing to compel the prosecution to allow counsel for the defense to use, on cross-examination, a statement shown to a witness while on the stand and testifying for the prosecution. During the examination of William Cobleigh, a witness for the prosecution, the deputy district attorney, for the purpose of refreshing the witness' recollection, produced and showed to him a phonographic report of a statement made by him at the office of the district attorney about ten days after the death of Mrs. Sieber. Counsel for the defense expressed a desire to examine the document, and the record indicates that he was given full opportunity to do so. The defense did not at that time exercise its right to examine the witness as to the circumstances and conditions under which the statement was made, or what it contained, but allowed the examination to proceed. When the attorney for the defense took the witness on cross-examination he requested that the deputy district attorney hand him the state-

ment with which Cobleigh had refreshed his recollection, in order that he might "properly cross-examine the witness." Before the deputy district attorney could comply, and without any objection being made by the prosecution, the court, of its own motion, ruled that the defense was not entitled to the statement, for the reason that it was not in evidence, that it was a private affair, and it had been permitted to be used by the witness to enable him to refresh his memory. On counsel attempting to state the purpose for which he desired the statement, the court declined to hear him, and directed him to proceed with the examination. Later, and upon several occasions during the cross-examination of Cobleigh, the defense made further demands on the prosecution for the production of the statement. Each was met by the arbitrary refusal of the trial court to accede to the request. We are of the view that, as conceded by the attorney-general, the court committed error. Section 2047 of the Code of Civil Procedure provides that a witness is allowed to refresh his memory respecting a fact by anything written under his direction, at the time when the fact occurred, or immediately thereafter, or at any other time when the fact was fresh in his memory, and he knew the same was correctly stated in writing. "But in such case," the section provides, "the writing must be produced and may be seen by the adverse party, who may, if he choose, cross-examine the witness upon it, and may read it to the jury." We are unable to agree with the argument of the district attorney of Los Angeles County, based upon a considerable quotation from the record, that, because the witness on direct examination must have read only a small portion of the statement for the purpose of refreshing his recollection, the defense was not entitled to use the whole of it. He appears to take the position that, because counsel for the defendant had full opportunity to see the statement, and presumably became acquainted with its contents, the provisions of section 2047 *supra,* had been fully complied with. The district attorney is contending for an undue limitation of the procedure permitted by the code section. It therefore remains to determine whether or not the error of the trial court caused any such prejudice to the cause of the appellant as to warrant a reversal of the judgment.

We do not think the ruling of the court, though erroneous, resulted in a miscarriage of justice. Cobleigh had testified on direct examination that he had last seen Sieber at the yard between 8:20 and 8:30 o'clock; that it took approximately half an hour to drive to 21st and Toberman Streets, and that Sieber arrived at about twenty-five minutes past 9. He stated that he testified as to time without having seen a watch or clock, and could not compute time if he had. nothing to go by, and that, in his testimony, he had not stated any exact time. It would seem, from the record, that the main purpose of the defense in demanding the right to use the statement made by Cobleigh at the district attorney's office was to enable it to cross-examine the witness on the matter of time. We have read with care the record of the cross-examination, and are of the view that little more, if anything, could have been accomplished by the use of the statement, or any number of statements, than was accomplished in the minute and particular cross-examination to which the witness was subjected. The record indicates that the defendant's counsel must have been well informed as to what was in the statement, and no doubt they were, from the examination made when it was first shown to the witness. Cobleigh's recollection of every point of time material to the movements of the appellant, and his ability to state the time were thoroughly gone into, and we are satisfied, from the entire record relating to the incident, that no prejudicial error resulted from the refusal of the court to direct the production and delivery of the statement to the counsel for the defense.

[7] While the appellant was incarcerated in the county jail awaiting trial, another prisoner by the name of Mortimer was placed in the same cell. He was permitted, over objection, to testify to certain conversations between himself and the appellant. Beyond contending that the testimony was incompetent, and not within the exception to rule as being a declaration or admission against the defendant, the appellant has not pointed out how, or in what manner, the evidence was inadmissible, or in what manner its admission tended to prejudice him. We are therefore unable to consider the objection. The credibility of the witness, and the weight to be attached to his testimony, were matters addressed to the consideration of the jury. The contention that

the court erred in permitting the prosecution to introduce certain portions of the testimony of the witnesses, Ingmire, Glenn, and Herrera, is without foundation. It is next contended that the court erred in restricting the cross-examination, by counsel for the appellant, of certain witnesses for the prosecution, for the purpose of testing the witnesses' power of observation with relation to certain matters testified to. We have carefully examined the record as to each of these specifications of error, and are satisfied that the court did not abuse its discretion in limiting the cross-examination as it did. The appellant had ample opportunity in this respect to fully develop his theories, and to get from the witnesses under cross-examination everything to which he was properly entitled. The contention that the trial court erred in refusing to permit counsel for the defense to ask the witness, Mortimer, certain questions on cross-examination, tending to show interest and bias, is without merit. The record discloses that the questions were subsequently permitted to be, and were, fully answered.

[8] Another assignment of error is predicated upon the action of the trial court in allowing the prosecution to introduce in evidence the pieces of blue-print found near the body of the deceased. The pieces of blue-print were part of the *res gestae,* having been found on the floor of the room in close proximity to the dead body and, as such, were admissible. There was also evidence which tended to connect the appellant with them. Less than an hour before the killing appellant was seen with a roll of blue-prints in his hand, and it was shown by testimony of the witness, Ingmire, that at a considerable time before the homicide he had given Sieber a blue-print in connection with their common employment, which had never been returned to him. The witness recognized the tracing on at least one of the pieces of blue-print found near the body of the deceased, and testified that it looked something like the map he had given to the appellant on that occasion.

During the course of the trial counsel for the defense asked certain questions of witnesses, which were answered in a manner not responsive to the questions. In two instances here complained of, and on motions of the prosecution, the court improperly struck out the testimony on the ground that the answers were not responsive. [9] An ob-

jection that an answer is not responsive is one that can be made only by the party who asks the question, if the answer is otherwise admissible (*Hirshfeld* v. *Dana*, 193 Cal. 142, 148 [223 Pac. 451]); but appellant was not prejudiced by the action of the trial court. The answer of the defendant that the witness, Mortimer, "said he was in [jail] for throwing pepper in the cop's eyes," while indirectly responsive to a question, related to a collateral matter of no particular import to the case of the appellant. The other answer, concerning a package of meat which the appellant took home on the day of the homicide, was but a repetition, in substance, of an answer that had been previously given, and which was permitted to remain in the record. The objection of the appellant to the question asked him on cross-examination, if he had supported his wife during a certain period, was properly overruled, although the criticism to the form of the question is not entirely without merit.

[10] The witness, Cobleigh, one of the crew working under appellant and a witness for the prosecution, testified that he and the other two men comprising the crew loaded the truck at the city yard on the morning of the homicide. Counsel for appellant sought to impeach Cobleigh's testimony by saying that he had made, at other times, statements inconsistent with his testimony given at the trial. The witness had been interviewed by Mr. Toomey, an attorney for the appellant, and on cross-examination, testifying as to what occurred on that occasion, said he did not tell the attorney that he saw Sieber help load the truck. On further cross-examination, after laying the foundation for impeachment, counsel asked the witness: " . . . whether or not at the same time and place [he] did not tell [Toomey] that Charles Sieber helped [him] load the truck?" The witness answered "No, I did not tell him." The answer was allowed to remain in the record, but, after argument, the court sustained an objection of the prosecution that the defense was attempting to impeach on a collateral matter. We are not in accord with the ruling of the trial court. The actions and movements of the appellant, during the time he claimed to be at the city yard on the morning of the homicide, constituted a most material element in the case. If the witness, Cobleigh, had made contradictory statements concerning the presence of the appellant during that period, the appellant had the right to

show the fact, as affecting the weight and credibility to be attached to the witness' testimony. There is much in the record, however, from which it appears to be satisfactorily established that the appellant did not assist his men in loading the truck. He, himself, testified that he only told the men "what to load . . . and was standing there by the truck until" called to assist a friend (Soroker) make some repairs to an automobile. When he returned "they [his crew] were just about through loading the truck." We cannot therefore say that the cause of the defendant was in any way materially injured by the action of the trial court.

[11] Appellant contends that, throughout the trial, "the trial judge was hasty, unreasonable, and humiliating to the defendant and his counsel," and that "the conduct of the court [was] of such nature and under such circumstances and conditions" as to prevent the defendant from having a fair trial. It is unnecessary for us to comment upon the tension under which able counsel labor in the conduct of a long and tedious trial in the defense of one charged with the most serious of all crimes. The trial judge, in such cases, is subjected to an equally severe burden. We have carefully read the specifications of instances in which it is contended the trial court overstepped the bounds of judicial fairness and decorum, and, while the record indicates that at times friction was engendered between the court and counsel for the defense, we find nothing in the attitude or action of the court to warrant the feeling that the defendant was thereby prejudiced or prevented from having a fair and impartial trial.

[12] Appellant complains of what he terms the "shocking conduct and shameful tactics" of the deputy district attorney who conducted the case for the People in the trial court. The prosecuting officer may have been overzealous at times, but we are not persuaded that he was so unmindful of the duty he owed both to the state and to the defendant as to use his office "as an engine of persecution," as charged by the appellant. We are unable to say that questions charged to have been asked by the deputy district attorney in bad faith were, in fact, improperly propounded. Neither are we convinced that during his argument to the jury that officer purposely referred to matters not in the record, or intentionally made misstatements of law, for the purpose of misleading the jury. The right of counsel to discuss the

merits of a case, both as to the law and facts, is very wide, and he has the right to state fully his views as to what the evidence shows, and as to the conclusions to be fairly drawn therefrom. The adverse party cannot complain if the reasoning be faulty and the deductions illogical, as such matters are ultimately for the consideration of the jury. (8 Cal. Jur., p. 263.) From the record of the portions of the argument of the deputy district attorney to the jury, to which objections are now made, it appears that there were mutual recriminations between counsel for the state and for the defendant respecting their official and professional methods. These occurrences were, as is always the case, unfortunate and ill-timed, but we cannot agree with the appellant that the actions and attitude of the deputy district attorney prejudiced his cause. The record discloses that, while in some instances counsel for the defense assigned the conduct of the deputy district attorney as error and misconduct, in many other instances they merely noted an exception to what the attorney did. [13] The rule is that when a district attorney is guilty of misconduct in the trial of a criminal case, it is ordinarily the duty of counsel for the defense promptly to call the attention of the court thereto, and assign it as misconduct, or request the court to instruct the jury to disregard it. Such assignments and requests are necessary as a foundation for a complaint to this court. (*People* v. *Routh*, 182 Cal. 561, 567 [189 Pac. 463]; *People* v. *MacDonald*, 167 Cal. 545, 551 [140 Pac. 256]; *People* v. *Bishop*, 134 Cal. 682, 685 [66 Pac. 976].) There may be cases in which the act done or remark made is of such a character that a harmful result cannot be obviated by any retraction or request. For the same reason, the want of an assignment of misconduct cannot affect appellant's rights, where such assignment could not have led to the curing of the harm done. (*People* v. *MacDonald, supra.*) A careful reading of the record, however, satisfies us that the present case is not within these exceptions to the general rule.

The order denying the motion for a new trial and the judgment appealed from are, and each is, affirmed.

Curtis, J., Richards, J., Seawell, J., Shenk, J., and Preston, J., concurred.

Rehearing denied.