[Crim. No. 2740. First Dist., Div. Two. Oct. 25, 1951.]

THE PEOPLE, Respondent, v. MICHAEL R. SIMON, Appellant.

George Nye, Public Defender, and John B. Reilley, Assistant Public Defender, for Appellant.

Edmund G. Brown, Attorney General, and David K. Lener, Deputy Attorney General, for Respondent.

NOURSE, P. J.—Defendant appeals from judgments on eight verdicts finding him guilty of eight counts of grand theft and from the order denying his motion for a new trial as to each count. A prior felony conviction (two counts of forgery) had been alleged and found.

All counts have some relation to the estate of Dr. Emile G. Schuster, who died on December 23, 1949. Defendant became a patient of the doctor in April, 1949, and later audited the doctor's books once a month. He was also preparing the income tax returns of the doctor for the year 1949, in which year the doctor did not make quarterly payments on estimated income. Defendant had received $1,500 from the doctor for those services. Under the doctor's will his mother, Mrs. Marie Schuster, and his son, Emile L. Schuster, then a minor going on 20, usually called Junior as will be done hereinafter, were the main beneficiaries. The death of the doctor caused his mother, who until then had been living with him, such mental strain that she was hardly able to handle her own affairs. Junior had been in military service and had since then worked in Ohio. He had no knowledge of the financial and business matters of his father or of such matters in general. The assets of the estate amounted to $50,000 to $60,000, mostly in commercial and savings bank accounts, war savings bonds, and stocks; there was also a large amount of accounts receivable for doctor's services and the lease and goodwill of the doctor's office. Mr. Stephen Casalina, the attorney of the doctor, assisted Mrs. Schuster in handling the petition for probate of the will and her appointment as executrix. Stella Painter, who had been the office nurse of the doctor during the last two years preceding his death, stayed temporarily in the office to take care of current matters and later when the doctor's practice and office were taken over by Dr. Gleason

she stayed as his nurse. The first five counts relate to thefts from Mrs. Schuster, the executrix, the last three counts to thefts from Stella Painter, the nurse. The theory of the People as to all counts was theft by trick and device. Several related acts of defendant not charged in the information were shown as similar offenses showing appellant's intent and purpose.

The evidence for the People was mainly as follows:

Mrs. Schuster contacted defendant around January 1, 1950, in connection with the tax work he was doing for the doctor. She had several conferences with him in the first half of that month at which Junior and her son William Schuster, a longshoreman, were always present. It was first agreed that defendant would complete the preparation of the income tax. He told them that he was a certified public accountant working for doctors and attorneys. In later conversation he told them that he was immensely wealthy, that he had $200,000 in a safe deposit box and that he just did this work for a pastime, and later still that he had an automobile agency from which Army and Navy had to buy both in Oakland and in Reno. He actually had a business there under the name of Simon's Buyers Service, which sold some cars at a discount to military personnel. When defendant found out that Mrs. Schuster was not satisfied with Mr. Casalina he proposed that as a favor he would take over the administrative and estate tax work of the estate. He said he did it out of gratitude as the doctor had been the only physician who had been of any help to him. However when the income tax work had been completed and the tax paid he asked whether a salary of $2,000 would be convenient without mentioning that he had already received $1,500 for that work. The $2,000 was paid. When on January 13th Mrs. Schuster had been appointed executrix and his services for the estate had been accepted, he made her sign and her son William and Junior witness a power of attorney to administer and manage the estate which in that document he called "Power of Appointment." He gave as the reason that without it the banks and brokers who held the assets of the estate would not give him the required information and records. At the signing of this power William Schuster asked defendant whether that power did not entitle him to touch any of the money of the estate. Defendant answered that it was only to get the records of the estate and to make certain arrangements but that it was definitely understood that only Mrs. Schuster as executrix would have the right to touch the

moneys of the estate. After that he assisted Mrs. Schuster in having the different accounts of the doctor changed into her name as executrix and in bringing about arrangements as to the doctor's practice and accounts receivable. Dr. Gleason took over the office under the obligation to pay the estate a percentage of his receipts and Stella Painter undertook the collection of the accounts receivable for which she would be paid 25 per cent of her collections. The collections were paid by her into the account of the executrix at the Bank of America, 12th and Broadway Branch in Oakland. Monthly, after Mrs. Painter's accounts had been audited by defendant her salary of 25 per cent was paid her by check on that account by Mrs. Schuster. In that account also were deposited the payments of Dr. Gleason and on that account Mrs. Schuster drew for rent of the office and living expenses for herself and Junior. Defendant told her that she was allowed to make those withdrawals but that otherwise before the settlement of the estate no assets could be disposed of without court permission.

Late in January he told Mrs. Schuster that attending to automobile and accountancy business both in Reno and Oakland was too much for him and that he was going to concentrate on Reno and live there. He said the assets of the estate should be in one account for administration and settlement and that for convenience that should be with him in Reno. They would then be put in an account of the estate of Dr. Emile G. Schuster and not be touched. He also said that out of gratitude to the doctor he would treat Junior as his son and teach him the automobile business and make him earn a living. Junior would also act as intermediary between defendant who could not often come to Oakland and Mrs. Schuster. Mrs. Schuster should send him all financial records and vouchers and should follow all directions defendant would send her through Junior and not speak about them with other people. Another ground given later to Junior for bringing all assets to Reno was that there they were safe from attachment by Mrs. Painter who according to defendant asserted a doubtful claim against the estate. More will have to be said about this claim later. In early February Junior followed defendant to Reno where he was given little opportunity to learn or work but much to spend money provided partly by Mrs. Schuster but mostly by defendant. Repeatedly defendant sent him to Mrs. Schuster with directions to have her take money from specified accounts of hers as executrix and transfer

it through Western Union to a specified account of defendant in Reno. The instructions to Junior were detailed on note pads. The two earliest of such remittances brought out at the trial ($2,000 on February 15th and $2,100 on February 23d) were not part of the information but shown as similar offenses only. Thereafter defendant sent Junior down again with directions to get money from the account in the Berkeley Guarantee and Savings and Loan Association and to send the money to the account Mike Simon in the First National Bank of Nevada, First and Virginia Branch, Reno. Defendant also had an account Michael Simon, Trustee in that bank into which some other moneys of the estate were deposited, but several transfers he directed to be made to his personal account. Junior had his grandmother execute the directions and in accordance with them she withdrew $2,050 from her account on February 27th, bought with it a Western Union money order to be credited to said "Mike Simon" account to which its amount of $2,040.97 was credited on February 28th. On March 4th, defendant received in the same account $5,077.09 from the estate not charged in the information. On March 21st defendant returned $2,000 or $2,500 through Junior when Mrs. Schuster complained that the balance in the Bank of America at 12th and Broadway, Oakland, had temporarily become too low for current needs but a few days later he instructed Junior to have money taken out of the account and sent to him in the same manner as the money sent on February 27th. This was done and accordingly a Western Union money order of Mrs. Schuster for $2,500 was credited to the "Mike Simon" account on March 27th.

In the meantime defendant had formed a Nevada corporation "Fleet Sales, Inc." to continue the automobile business he had done under the name Simon's Buyers Service. He offered Mrs. Schuster and Junior a living in the new corporation on the following basis: Junior was to become president, Mrs. Schuster, vice-president and defendant, secretary-treasurer. Mrs. Schuster would get $200 a month out of it. The setup of the corporation was that Junior would hold seven, Mrs. Schuster three, and defendant three shares, but actually defendant would furnish the money required. No money of the estate would be touched for it. Defendant told Junior he had to take $4,000 out of his safe deposit box for Fleet Sales, Inc. but because that money was not accounted for with the tax authorities, he wanted a fictitious loan from Mrs. Schuster to that amount and he gave Junior a note of

his in behalf of Mrs. Schuster for $4,000 dated March 5, 1950, which Junior showed to Mrs. Schuster and put away for her. No money was actually lent to defendant. Neither Mrs. Schuster nor Junior received certificates of stock. They signed minutes prepared by defendant without any meetings actually having been held. On March 10th they signed the agreement by which Fleet Sales, Inc. took over the assets and liabilities of Simon's Buyers Service with as only consideration defendant's position in Fleet Sales, Inc. The actual direction was solely in the hands of defendant, who acted as if he owned the business—even after he had formally resigned as secretary-treasurer. Junior signed checks for Fleet Sales, Inc. but on instruction of defendant. Some of the favors defendant did for Junior and Mrs. Schuster he did through Fleet Sales, Inc. He proposed in the beginning of April that Fleet Sales, Inc., without additional cost, should take over the collection of the accounts receivable of the estate on which Mrs. Painter had collected more than $5,000 but which had begun to lag. The testimony of Mrs. Schuster and Junior that defendant was to furnish the money for Fleet Sales and that no money of the estate would be touched is corroborated by Frank Baker the manager of the Oakland office of Fleet Sales whom defendant told that he was setting up Junior in the business as a friendship gesture and that the money to run Fleet Sales, Inc. came from defendant's personal funds; that Fleet Sales, Inc. was collecting temporarily for the estate to save Mrs. Schuster expenses and several times that the funds of the estate could not be used and could not be touched by anybody before the estate had gone through probate.

At the end of March defendant sent Junior down again to California to arrange the sale of stock of the estate held by Davies and Mejia in San Francisco, the proceeds of which should also go into the account in Reno. He instructed Junior to ask the assistance of Mr. Casalina to obtain the approval of the probate court for the sale. However Mr. Casalina, who had been pressing defendant for an inventory of the estate, refused to act. He gave as his opinion that moneys and bank accounts, of which he did not receive a listing, should be sufficient for the taxes and administration costs and that he was opposed to selling stock which he considered A-1. Informed by Junior of the refusal of Mr. Casalina, defendant procured Mr. Carl P. Abbott and his associates to be substituted for Mr. Casalina as attorneys for the estate. Relying on information given by defendant and approved by the

executrix that the sale was necessary to raise cash to pay costs of administration and taxes, Mr. Abbott petitioned for and obtained the authorization of the court to the sale. Davies and Mejia paid over the proceeds to the executrix in three checks totaling $15,672.24 and dated April 13th and 14th which she endorsed in blank and which were handed over to defendant who endorsed two in his own name and one in behalf of Fleet Sales, Inc.

Approximately at that time defendant instructed Mr. Baker of Fleet. Sales, Inc. to take Mrs. Schuster to the bank where she had war bonds in a safe deposit box and then to the Crocker National Bank for the cashing of those bonds. This was done. Approximately two weeks later Mr. Baker took her again to the Crocker National Bank to receive a cashier's check for the amount cashed. With that cashier's check they bought a Western Union money order of $5,737.50 to Michael Simon, care of First National Bank of Nevada, First and Virginia Branch, Reno. It was endorsed by defendant and deposited by him on April 27th in his trustee account with said bank, which account at that date had been overdrawn by a withdrawal of $2,500. On that same date defendant had bought at that bank a cashier's check of $2,500 payable to Marie C. Schuster, which he sent to Mr. Abbott, her attorney, who had made a settlement of $2,500 with a beneficiary under the will of Dr. Schuster. The fact that the money came by cashier's check from Reno was a reason for Mr. Abbott, who did not know that the assets of the estate had been transferred to defendant, to press for an inventory. Defendant stalled, giving as an excuse that the accounts receivable had first to be liquidated.

On May 17th defendant instructed Mr. Baker to pick up Mrs. Schuster at her home and bring her to the Oakland office of Fleet Sales, Inc. There defendant asked her whether she had some more money as he had to have all together for the keeping of the account and the taxes. He instructed Mr. Baker to get a blank check on the Bank of America, had another employee of Fleet Sales, Inc., make it out for $1,000 to Michael R. Simon, had Mrs. Schuster sign it and instructed Mr. Baker to cash it. Mr. Baker did so and gave the money to defendant.

After defendant had obtained the last $1,000 from her Mrs. Schuster told her son William of all the money she had given to defendant. The Schusters as well as Mr. Abbott became worried. Both Mr. Abbott and William Schuster

separately visited defendant in Reno in June to find out how matters stood and where the money was. Defendant told William Schuster around June 20th that the funds of the estate were intact in a bank, that the following week he would be in Oakland and that the estate could be settled. Mr. Abbott demanded that all the assets of the estate be turned over to Mrs. Schuster. Defendant first promised him that on June 20th he would come to Oakland to settle everything and then postponed the meeting with Mr. Abbott and the Schusters to June 27th, at which time he did not come either. He was arrested without having returned any of the funds or having given any account of them.

The obtaining by defendant from Mrs. Schuster of the $2,040.97 on February 28, 1950, the $2,500 on March 27th, the $15,672.27 on April 14th, the $5,377.50 on April 27th and the $1,000 on May 17th form the basis of counts 1 to 5 of the information.

With respect to the next three counts, relating to Stella Painter, the evidence was as follows: When defendant in the beginning of April, 1950, told Stella Painter that the collection of the accounts receivable was going to be taken from her and given to a "collecting agency," she showed him a receipt of Dr. Schuster dated 9-2-1948 for an amount of $1,400 received from her as a loan, and told him that that note had not been paid. Defendant said that it was a perfectly good note and that he would present it to the attorney for payment. She thereupon gave him the note. He did not present the claim for her to the executrix or to Mr. Abbott, the attorney of the estate, and did not tell them that he had the note. He had told Mr. Abbott that such a note was in existence but that he and Mrs. Schuster knew that it had been repaid and that he would take care of that matter. Around April 16th he showed the note to Junior and said to him that he had got it away from her (Mrs. Painter). Defendant offered the receipt in evidence at the trial. There was evidence that Stella Painter had loaned the money to the doctor for some of his stock transactions and no evidence of payment.

In early May, 1950, defendant offered to sell Dr. Gleason the practice of Dr. Schuster outright instead of on a percentage of receipts. Dr. Gleason was not interested in acquiring the accounts receivable, and in the presence of Dr. Gleason defendant offered to sell them to Stella Painter for $3,000, a price he said Mrs. Schuster had agreed to. He further told her that she had to put down $2,000 immediately and the rest

on approval of the sale by the court. Until said approval she had to deposit her collections for which the accounts were returned to her (Fleet Sales, Inc. had collected only a little on them) in the account of Mrs. Schuster. In accordance with instructions of defendant she paid him the $2,000 in a cashier's check dated May 17, 1950, payable to Michael R. Simon, Trustee, which defendant cashed. Defendant did not pay over the money to the executrix, who testified that she did not know either of the sale of the accounts receivable or of the outright sale of the practice, and Mr. Abbott was not instructed to ask approval of the sale.

In June defendant induced Dr. Gleason to give him an initial payment of $1,000 on the pretended outright purchase of the practice for $5,000. In accordance with defendant's instructions the $1,000 was paid in a cashier's check dated June 13, 1950, payable to Michael R. Simon, administrator of the estate of Emile G. Schuster, M.D. and so endorsed by defendant. This matter was shown as a similar offense.

Finally on June 24th defendant told Stella Painter by telephone from Reno that for the hearing of the settlement of the estate all money had to be available and that therefore Mrs. Schuster demanded that all moneys paid as salary for collections should be returned to him by telegraphic money order; the matter would be straightened out after the settlement in court. She sent him a telegraphic money order for $1,200 on the same date, which money order he cashed at the First National Bank of Nevada but did not deposit in any account there. It was not paid to the executrix.

At the trial it was shown that in neither of the two banks in Reno where defendant had accounts was there a separate account in the name of the estate or in defendant's name in special relation to the estate. In the First National Bank of Nevada there was an account "Mike Simon" of longer standing which from the middle of November, 1949, to the middle of January, 1950, did not show a balance over $5.00; it then mounted until on March 6th it reached a high of over $6,000 from which the trend was generally downward; since June 1, 1950, it stayed below $10. An account "Michael R. Simon, Trustee," in the same bank was opened with a deposit of $1,000 in January 28, 1950; the balance climbed until nearly $7,500 on March 21, 1950, and again to nearly $5,000 on April 17th and May 2d but then declined rapidly and from June 1st it contained less than $20. Both accounts showed a large number of deposits and withdrawals in round amounts

of hundreds and thousands of dollars. Many of the withdrawal checks were cashed at the Mapes Casino in Reno. Junior testified that he often saw defendant gambling there for high stakes. Sometimes they cashed checks there for other purposes but 90 per cent of the checks they cashed there were for gambling. There were also in the same bank two accounts "Fleet Sales, Inc." and "Fleet Sales, Inc. (Petty Cash Account)" which after June 1, 1950, together contained always less than $30. In the Nevada Bank of Commerce in Reno defendant had one account "Michael R. Simon" opened February 17, 1950, which on March 20, 1950, reached its apex of over $4,000 but on June 1st was down to below $2.00. On June 14th the balance again reached $1,000 to be practically exhausted after June 29th. Defendant also offered in evidence the statements of his accounts with Crocker First National Bank, Oakland. The accounts "Simon M" and "Simon, Michael R., Trustee" did not show a balance of any importance after the end of February, 1950; of the three accounts of Fleet Sales, Inc. in said bank two were closed on June 1, whereas the third, the "Petty Cash Account" since then contained less than $100. Mr. Baker, manager of the Oakland office of Fleet Sales, Inc., testified that around June 1st Fleet Sales, Inc. closed down and that defendant offered him to take over the Oakland office. Mr. Baker found that approximately $2,800 deposits on cars previously ordered and not delivered were owing, that the amounts of said deposits were not in the accounts and that also salaries were owing. Defendant promised to have the funds on hand at his lawyer's but he did not appear.

After the evidence with respect to all the above facts had been received G. L. Moore, Inspector of the Oakland Police Department, testified that when he was in Reno in July in the investigation of the complaint of Mrs. Schuster against defendant, he asked defendant about his financial situation and told him that allegedly there was about $59,000 missing from the estate, and that defendant answered: "They lie, it's $57,500," and further that it was unfortunate that he was arrested because he was working on a proposition that would have enabled him to pay back everything. He also said that he would prefer to waive extradition, enter a plea of guilty and get the matter over with as quickly as possible. He later told inspector Moore that he had gone to Las Vegas to secure some money to go to Mexico but that he did not want to leave his wife in the mess.

Appellant did not further stress the contention made in his

opening brief that the evidence was not sufficient to sustain the verdict. We shall nevertheless discuss this point first because the strength of the evidence will be of importance in the consideration of other assignments of error. The position of appellant is that Mrs. Schuster and Junior, as sole heirs of Doctor Schuster dealt with the assets of the estate as their own, that they appointed appellant to manage the estate, that they used the funds, and authorized use of the funds of the estate by appellant for investment in Fleet Sales, Inc., for the expenses of collecting the accounts receivable and for their personal expenses, and that only when they thought that the investment in Fleet Sales, Inc. was not going to be profitable, they claimed that appellant was holding the funds of the estate as trustee. As to the counts regarding Stella Painter appellant contends that under his power as manager he took possession of the note, sold the accounts receivable and held for future disposition of the court sums paid to Mrs. Painter without authorization of the probate court. It is further asserted that erroneous rulings of the court prevented defendant from presenting this defense. However appellant does not point out any evidence which tends to support his position and the evidence clearly does not support it. The power given him related solely to acts of management of the estate permitted to the executrix herself and even if his authority had not been orally further clarified, as testified by the Schusters, it would not have permitted appellant to commingle funds of the estate with his own, or do other acts not permitted to a trustee. Any permission as asserted by appellant was most vigorously denied by the Schusters and appellant did not himself take the stand or present any other direct proof of such permission or any explanation under oath where the assets of the estate had gone or why no inventory or accounting could be obtained from him. Circumstances which unexplained might have indicated a permission to use estate funds for Fleet Sales, Inc., or the other purposes mentioned by defendant were fully explained by the Schusters and their explanations were not contradicted by any evidence from appellant and were corroborated by independent evidence, especially by that of the witness Baker.

Even without the confession or admission to Inspector Moore the evidence is sufficient to show that appellant obtained possession of the funds from Mrs. Schuster and the $1,200 return of salary of Mrs. Painter by the device of representing to the victims that he needed that possession for the

administration and probate of the estate, whereas he obtained the funds with the intent to apply them to his own use, immediately commingled them with his own funds and within a few months used them up; the $2,000 from Mrs. Painter he obtained by representing that it was payment or deposit for a sale of the accounts receivable, which sale needed court approval, but, instead of keeping the funds available until such approval had been obtained or denied he took them intentionally for his own use, and took no steps to effectuate the sale; the note he obtained from Mrs. Painter by the representation that he would present it for her to the attorney of the estate as a claim against the estate, whereas he took it with the intent "to get it away from her." ■ In this last count there was no intention of taking for defendant's own use, but for theft by trick or device, proof of fraudulent taking with intent to deprive the owner of the property is sufficient without proof that defendant intended to convert the property to his own use. (*People* v. *Juarez*, 28 Cal. 380, 382.) When the evidence of the People is accepted as true there is no doubt that each count constitutes a theft by trick or device and no argument to the contrary is presented by appellant. The above circumstances must be taken into consideration in deciding whether any of appellant's further grievances justify reversal.

■ At the arraignment appellant requested that the public defender be permitted to withdraw and he to appear in propria persona. This was done. He now contends that this constituted deprivation of his right to be represented by counsel because no hearing was instituted by the court to determine whether appellant was capable of "intelligently" waiving his right of representation by counsel. As his only authority appellant cites *In re Connor*, 16 Cal.2d 701, 709 [108 P.2d 10]. There it is said: "A defendant who, *with an intelligent conception of the consequences of his act*, declines the aid of counsel prior to or at the commencement of his trial, is not entitled thereafter to interrupt and delay the hearing at any stage he deems advantageous merely to interpose a demand for legal assistance. [Citations.] *When petitioner stated at the time of his arraignment that he did not need an attorney, the court was justified in taking him at his word.*" (Italics added.) Appellant's own citation sufficiently refutes his contention. Neither this case nor any other requires an intelligence hearing before permitting defense in propria persona. (See similar to the Connor case, *People* v. *Cortze*, 108 Cal.App. 111 [290 P. 1083]; *People* v. *O'Neill*,

78 Cal.App.2d 888 [179 P.2d 10].) No contention is made that in this case there was any special indication that defendant, an accountant with prior felony conviction, was not able intelligently to waive counsel. That the court at the end of the trial without appointing counsel advised defendant to accept the assistance of the public defender to preserve all of his legal rights is no indication of lack of intelligence of defendant but only of the court's care for his protection.

Appellant further asserts a large number of errors of law in the admission and rejection of evidence. It is first contended that on three occasions valid objections of appellant were completely ignored. In some of the instances cited the objections were defective but in all three instances the evidence received after objection was so unimportant and so evidently harmless as not to require separate discussion.

Next appellant complains of two instances in which he contends that a ruling on objection was made by the district attorney and not by the court. ▮ In the first example cited appellant, after an answer which contained hearsay had been given, said, "I object" without giving any ground for the objection or moving to strike the answer. Both the absence of any specified ground and of a motion to strike prevent consideration on appeal. (*People* v. *Nelson*, 85 Cal. 421, 428 [24 P. 1006] ; *People* v. *Sellas*, 114 Cal.App. 367, 378 [300 P. 150] ; *People* v. *Cucco*, 85 Cal.App.2d. 448, 453 [193 P.2d 86].) The so called ruling of the district attorney was his comment: "If it is what your grandson said, we will have to have him testify about it." ▮ In the second example after the power of attorney from Mrs. Schuster to defendant had been read the district attorney asked: "It says nothing about funds, does it? A. Not a thing, no." After the answer was given appellant objected on the ground that the document was the best evidence. The district attorney conceded that the objection was good and said that the answer might go out. As appellant again had not moved to strike the answer there was no reason why the court should expressly order it stricken.

▮ Appellant complains that the court on its own motion objected to a question of appellant as to the total of the deposits on a bank statement of Fleet Sales, Inc., whereas the court did not object on its own motion to questions of the district attorney as to the totals of checks cashed by appellant at the Mapes Casino according to his account there. However the objection as to appellant's question was not on the court's own motion as the district attorney had said: "I will submit

the exhibit speaks for itself,'' and appellant cannot complain about the failure of the court to object where appellant did not do so himself.

Next appellant criticizes questions of the district attorney eliciting opinions or conclusions of witnesses or hearsay, which will not be reviewed because no objection whatever was made. At one place after some leading questions had been asked and answered appellant said, ''I object to the line of leading questions,'' without moving to strike anything. The district attorney: ''I will withdraw it.'' Appellant can again not complain that the court did not take any further action without being asked to do so.

Finally appellant contends that he was prevented by erroneous rulings from developing evidence material to his defense.

(a) After Junior had testified that he knew that his father had paid Stella Painter $435 a month whereas his successor paid her only $250 a month objection was sustained to the question ''So there was $185 to be paid each month?'' The question assumed that somebody had to pay the differential whereas in that respect Junior had testified only that he did not recall. Further development of the evidence with respect to this point was not prevented by the sustaining of the objection but by the fact that appellant did not ask further questions so formulated as not to assume matter not in evidence.

(b) Objection was sustained because of irrelevancy to appellant's question on recross-examination of Mr. Casalina: ''You have testified that it is not necessary to know what these accounts receivable are worth. Are you familiar with tax regulations beyond a $60,000 income?'' Mr. Casalina had testified on redirect in substance that the fact that the accounts receivable had not been liquidated and the actual proceeds were unknown did not prevent defendant from preparing an inventory because they should be listed and their value determined by the income tax appraiser. As this testimony was an expert opinion Mr. Casalina's qualifications were relevant. However it is not clear what is meant by ''the regulations beyond a $60,000 income,'' what materiality these regulations have for Mr. Casalina's expert testimony or in how far such an income is involved in this case. As the connection with Mr. Casalina's testimony and the relevancy were not shown by appellant the sustaining of the objection was not erroneous.

(c) Objection was sustained to defendant's asking

Stella Painter whether a certain letter purportedly written by Mrs. Schuster was in Mrs. Schuster's handwriting. Earlier Mrs. Schuster had testified that she might have written the letter but reading of the letter in evidence was then denied on the ground that the letter was immaterial. The reasons given for the objection by the district attorney that the question called for the opinion and conclusion of the witness and that she was not responsible for what she did not do herself fail to take into consideration section 1943, Code of Civil Procedure, which permits proving of handwriting by anyone who has knowledge of the handwriting of the purported writer. However, no foundation by showing of such knowledge had been laid and there was no error and no prejudice because the letter attempted to be proved had been found immaterial, a ruling not attacked.

It is contended that the district attorney took advantage of appellant's lack of knowledge of the law of evidence which explains his failure to object and that all the above taken together is repugnant to a fair trial. Study of the whole transcript has convinced us that appellant's grievances as to evidence are trivial and that all considered together they did did not impair the fairness of his trial.

Appellant next contends that he was deprived of the right to have the process of the court to subpoena witnesses in his behalf. Appellant requested before the trial that a representative of the First and Virginia Branch of the First National Bank of Nevada at Reno be subpoenaed with the records of the appellant's several accounts there. Although his request to subpoena this and other witnesses is not made part of the record and no inclusion in the record was asked, it is proved as to this witness by a statement of the court: "The defendant requested that the subpoena be issued, but the Court, not having jurisdiction out of the state, did not issue the subpoena." Appellant argues that section 1334.3, Penal Code, gave the court power to issue a certificate that a person in another state is required as a material witness and have that certificate presented to a court of the state in which such person is found if said state has provisions for commanding such person to testify in this state and that Nevada has such provision in section 11359, Nevada Compiled Laws. The question whether appellant's request was sufficient to require the trial judge to proceed under section 1334.3, Penal Code, became moot when such a representative appeared at the trial, with the desired records, as a witness for the People. ▮ Sec-

tion 1990, Code of Civil Procedure, reads: "A person present in court, or before a judicial officer, may be required to testify in the same manner as if he were in attendance upon a subpoena issued by such court or officer." The court therefore had the opportunity to comply with appellant's request and it was error not to do so, especially when appellant at the trial clearly indicated that he still wished to make the representative of the bank, Mr. Friesen, his witness. When appellant asked whether Mr. Friesen was going to be available for direct examination by him the district attorney said "Go ahead and ask questions. He's here for that purpose now," but thereafter he objected to some of appellant's questions as not proper cross-examination, and the objection was sustained.

Nevertheless a realistic consideration of the effects of the error on appellant's defense must lead to the conclusion that he suffered no prejudice that could justify a reversal. Appellant had not asked for an individual witness with any special knowledge but only for a representative of the bank with the records of his accounts and was willing to accept Mr. Friesen as such. His bank statements had been received in evidence and defendant was at liberty to cross-examine as to them. He was prevented from using the witness for three other purposes: To ask the witness questions about the fact that checks had been signed by Junior, have the witness link up those checks to have them received in evidence and have him testify that the cashing of the checks at Mapes Casino did not prove that they were for gambling purposes, points as to which the witness had no special knowledge, whereas other witnesses thereafter fulfilled appellant's purpose. Junior testified at length concerning the checks he signed (which he said he signed on instruction of defendant); the checks were received in evidence and the cashier of Mapes Casino testified that the Casino was the normal place for cashing of checks by hotel guests for any purpose. Appellant does not show any prejudice suffered by the restriction of his examination of the witness Friesen to cross-examination and there was none.

Appellant complains of the court's failure to give on its own motion an instruction that confessions and admissions are not admissible as evidence without independent proof of the corpus delicti, notwithstanding the fact that the testimony of Inspector Moore involving such evidence had been received and the court had instructed on the definitions of confession and admission and the caution with which oral admissions are to be used. That such may be reversible error is shown by

*People* v. *Frey*, 165 Cal. 140, 147 [131 P. 127]; *People* v. *Putnam*, 20 Cal.2d 885, 890-91 [129 P.2d 367]; *People* v. *Dobkin*, 74 Cal.App. 2d 269, 277 [168 P.2d 729]. However in the present case the evidence apart from appellant's statements to Inspector Moore so fully established the corpus delicti; that the failure to give the instruction pointed out by appellant, cannot have been prejudicial and therefore not reversible error (8 Cal.Jur. 348; *People* v. *Tomalty*, 14 Cal.App. 224, 236-37 [111 P. 513]).

Appellant also complains of the failure to instruct on the necessity that a confession be free and voluntary. Inspector Moore expressly testified to the free and voluntary character of defendant's statements. Defendant did not intimate in any way that his statements were not free and voluntary, he stressed on cross-examination his friendly relation with the witness during his arrest and he did not offer the instruction. No contention that the statements were not free and voluntary is made on appeal. Under these circumstances the failure to give the instruction was not error. (*People* v. *Gonzales*, 24 Cal.2d 870, 875 [151 P.2d 251]; *People* v. *Hubbell*, 54 Cal.App.2d 49, 74 [128 P.2d 579]; *People* v. *Landry*, 106 Cal.App.2d 8, 11-12 [234 P.2d 736].)

Appellant asserts that after he had been arguing for approximately two hours the court told him that he would be allowed only 20 minutes more, that he vigorously protested that he was not able to finish his argument in that time, but that nevertheless he was not allowed to continue his argument when the 20 minutes were up. It is conceded that such does not appear in the record, but appellant contends that he could not have evidence to that effect included in the record because the reporter did not report his argument and the restriction on it by the court. He suggests augmentation of the record under rule 12 of the Rules on Appeal or by submission of affidavits and counteraffidavits. It is further conceded that courts have a reasonable discretion in limiting argument (8 Cal.Jur. 261, § 325), but it is contended that the limitation in this case was unreasonable, an abuse of discretion, considering the number of counts and the extent of the evidence involved, citing cases in which reversal on that ground is found: *People* v. *Fernandez*, 4 Cal.App. 314, 321 [87 P. 1112] (time limited to 1¾ hours and 20 minutes additional time given); *People* v. *Keenan*, 13 Cal. 581 (limited to 1½ hours in a capital case); *People* v. *Green*, 99 Cal. 564 [34 P. 231] (1 hour).

Appellant's contention that the reporter's failure to report his argument and the restriction on it by the court prevented him from making it part of the record is not correct. Rule 36b of the Rules on Appeal describes the procedure to be followed in such a case (settled statement, *People* v. *Chessman,* 35 Cal.2d 455, 461-62 [218 P.2d 769] ). If we should order the augmentation of the record we should have to order under rule 12a the preparation and transmission of just such a settled statement as could have been prepared on application of appellant under rule 36b. In *Russi* v. *Bank of America,* 69 Cal.App.2d 100, 102 [158 P.2d 252], we quoted thus from 17 So.Cal.L.Rev. 130-31: " 'Even where the matter sought to be added is proper, or the proposed correction is warranted, neither augmentation nor correction is a matter of right; they both may be denied for inexcusable neglect in preparing the record, for delay in presenting the application, or for other reasons. The new rule does not deal expressly with this aspect of the question and the discretion of the court to deny the application still remains. Hence the augmentation procedure is not to be regarded as a cureall, nor as an assurance that negligent preparation of the record will entail no harmful results.' " Although we are inclined to permit augmentation of the record liberally in furtherance of justice, we have come to the conclusion that in this case ordering the augmentation would not be justified. On his motion for a new trial appellant did not make any showing of prejudice caused by the restriction of his argument, he neglected to have the matter included in the record on appeal, he did not move separately for augmentation prior to submission of the case on appeal and he does not indicate in his briefs any matter not argued to the jury because of lack of time which possibly might have influenced the verdict. His argument on appeal with respect to insufficiency of the evidence covers one page only of his opening brief and his position with respect to the facts there described, essential for the argument to the jury, is, as we have shown before, wholly inconsistent with the evidence which was one-sided because of appellant's failure to take the stand. Since the verdicts appellant has had the assistance of the public defender. It may also be pointed out that according to appellant's contention the court below did not limit the time for argument in advance as in the cases cited by appellant but after having listened for two hours to what appellant had to say. We are convinced that augmentation of the record would not serve any useful purpose and that appellant is not entitled to it.

Finally, appellant complains of alleged misconduct of the district attorney in deliberately eliciting improper testimony, unfairness in argument and commenting on facts not in evidence. However, no misconduct was assigned or instruction to disregard requested at any time, and it is not even contended that the alleged misconduct was of such character that it could not have been cured by any admonition. It is then no basis for reversal. (*People* v. *Sieber,* 201 Cal. 341, 356 [257 P. 64].) We have moreover considered the acts of misconduct alleged and have found all either clearly harmless and without importance or such that an assignment of misconduct could without doubt have brought correction.

The judgments and order denying a new trial are affirmed.

Goodell, J., and Dooling, J., concurred.

A petition for a rehearing was denied November 9, 1951, and appellant's petition for a hearing by the Supreme Court was denied November 19, 1951.