Filed 3/4/14  Vaughn v. Mahurin CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| LYNN VAUGHAN et al.,<br><br>    Plaintiffs and Appellants,<br><br>        v.<br><br>JOAN N. MAHURIN, as Trustee, etc.,<br><br>    Defendant and Respondent. | G048636<br><br>(Super. Ct. No. 30-2011-00478374)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Mary Fingal Schulte, Judge.  Affirmed.

Mollis & Mollis and Charles A. Mollis for Plaintiffs and Appellants.

Law Office of Susan D. Stein and Susan D. Stein for Defendant and Respondent.

\*          \*          \*

The adult stepchildren of Joan N. Mahurin (Joan) challenge the manner in which she divided an inter vivos trust on the death of her husband of 40 years, Walker M. Mahurin (Bud).[1]  They contend that she was hiding assets and that the court erred in its rulings with respect to witness credibility, breach of fiduciary duty, clarification of trust terms, witness examination, scope of discovery, and allocation of attorney fees.  They have not met their burden to show error.  We affirm.

I

FACTS

Bud and Joan created the Mahurin Family Trust dated October 1, 1996 (Mahurin Family Trust).  They had been married for 40 years when Bud passed away on May 11, 2010.

Bud had three children from a prior marriage—Lynn Vaughan, George Mahurin and Michael Mahurin (collectively, appellants).  Joan had one child from a prior marriage—Valerie Miller (Valerie).  Each of the four children was a remainder beneficiary of the Mahurin Family Trust.

On November 29, 2010, Joan, as trustee of the Mahurin Family Trust, signed a declaration of trust split.  Attached to that declaration were four schedules pursuant to which she allocated property to the various subtrusts as follows:  (1) Schedule A—the household furnishings, an unspecified bank account, a Rolls Royce, two boats and some unspecified jewelry to the survivor's trust; (2) Schedule B—the "upstairs" or "top portion" of certain Newport Beach property and miscellaneous personal property to exemption trust B1; (3) Schedule C—the "downstairs" or "bottom portion" of the Newport Beach property to exemption trust B2; and (4) Schedule D—the balance of the trust estate to exemption trust B2.

_____

[1]          "Hereafter, we refer to the parties by their first names, as a convenience to the reader.  We do not intend this informality to reflect a lack of respect.  [Citation.]"  (*In re Marriage of Balcof* (2006) 141 Cal.App.4th 1509, 1513, fn.2.)

2

In May 2011, appellants filed a petition in the probate court, seeking to challenge the trust split.  In short, they asserted that, on the death of Joan as the surviving spouse, the community property portion of the trust estate was to be distributed 50 percent to themselves collectively and 50 percent to Valerie.  However, because of the manner in which Joan had allocated property to the various subtrusts, the intended equal split between the two families would be thwarted, with the greater share being distributed to Valerie.  In addition, they claimed that there were substantial cash accounts and other assets that were not mentioned in the trust split and that valuations of the properties were needed.

On September 7, 2011, Joan executed a retraction of her prior declaration of trust split.  Attached to the retraction was a new allocation/inventory of assets as of date of death.

The inventory showed total community property of $1,309,617, comprised of:  (1) real property in Newport Beach valued at $1,100,000; (2) four Wells Fargo Bank accounts totaling $160,503; (3) one Bank of America checking account valued at $115; (4) two boats with a collective value of $18,000; (5) a nonoperational 1969 Rolls Royce valued at $5,999; and (6) household furniture and furnishings valued at $25,000.  The inventory also showed the separate property of Bud to be valued at $350 and the separate property jewelry of Joan to be valued at $5,000.  Joan allocated $654,808.50 in community property plus her $5,000 in separate property to the survivor's trust and $654,808.50 in community property plus Bud's $350 in separate property to the exemption trust.  She used only one exemption trust, explaining in a note that since there was no estate tax due, there was no need for a second exemption trust.

In October 2011, appellants issued deposition subpoenas to Union Bank with respect to two accounts—one checking account and one money market account. They sought bank records from January 1, 2005 to January 1, 2011.

Joan filed a motion to quash. She argued, inter alia, that the accounts in question were her separate property, held in her name alone, and that the deposition subpoenas invaded her right to privacy.

In her motion, Joan provided the following background information: "Following the death of Bud Mahurin, [she] retained attorney Samuel Kelsall to assist her with the . . . administration of the [Mahurin Family] Trust, and in November 2010, Mr. Kelsall prepared a 'Declaration of Trust Split' which was wholly incongruent and inconsistent with the terms of the [Mahurin Family] Trust. (Unfortunately, [she], as a lay person, signed this document without understanding it.)" Attached to her motion to quash was the declaration of Attorney Timothy J. Blied stating Joan's prior attorney, Attorney Kelsall, had prepared the erroneous declaration of trust split and that he, Attorney Blied, had attempted to resolve the matter with appellants' counsel, to no avail.

The court granted Joan's motion in part and denied it in part. It issued a protective order and directed Union Bank to comply with the deposition subpoenas, limited to a records period of May 11, 2009 to January 1, 2011.

In addition to the foregoing, Joan filed a petition for instructions. She pointed out ambiguities in the Mahurin Family Trust terms and sought clarification from the court on how to construe the Mahurin Family Trust. The court ordered that the Mahurin Family Trust be construed so as to require Bud's half of the community property, plus his separate property, to be placed in a single exemption trust, distributable to appellants on Joan's death, and to eliminate the need for either a second exemption trust or a marital trust. It also construed the Mahurin Family Trust so as to require the payment of income from the exemption trust to Joan during her lifetime and to permit the invasion of principal of the exemption trust for Joan's health, education, support and maintenance, without the prior exhaustion of the principal of the survivor's trust.

4

Appellants challenge the court's rulings on their petition, on Joan's motion to quash, on Joan's petition for instructions, and on witness examination at trial. They also challenge certain findings of the court.

II

DISCUSSION

A. *Credibility of Witnesses:*

In its March 27, 2013 minute order, the court stated: "The court has considered and weighed all the evidence, documentary as well as oral. The Court has weighed the credibility of the various witnesses. The Court found Valerie Miller and Joan Mahurin to be credible witnesses. Joan, now around 80 years of age, clearly suffered from memory loss and some confusion. But this did not detract from her credibility. Bud's children were also credible, as were the experts. So what it comes down to is a weighing of the evidence."

Appellants attack what they characterize as the court's "finding" that Joan suffered from memory loss. They say it was unsupported by the evidence. To the contrary, the record supports the court's comments about Joan's memory and mental state.

At trial, appellants' counsel asked Joan whether she had a certified public accountant (CPA) prepare the inventory and allocation. She responded: "I don't remember. I guess." The court then asked Joan how old she was. She could not remember that, either.

Joan was receiving services from a caregiver as well as assistance from Valerie, too. She admitted to having had a memory problem for a couple of years. The reporter's transcript well reflects that she was confused and forgetful at the time she testified. Indeed, while on the witness stand, she stated more than once, "I need help." At one point, the court expressed concern about Joan's age and ability to remember and asked, "[D]oes everybody feel she's up to doing this?"

5

There is no reason to detail each portion of the reporter's transcript reflecting confusion or memory issues. Just because there was no evidence that a doctor had diagnosed Joan as having memory loss, this does not mean that the court erred in its observation that she displayed memory issues and confusion during trial. In any event, the point of the matter is that the court weighed the credibility of the witnesses and found Joan to be credible.

"The trier of fact determines the credibility of witnesses, weighs the evidence, and resolves factual conflicts. We cannot reject the testimony of a witness that the trier of fact chooses to believe unless the testimony is physically impossible or its falsity is apparent without resorting to inferences or deductions. As part of its task, the trier of fact may believe and accept as true only part of a witness's testimony and disregard the rest. On appeal, we must accept that part of the testimony which supports the judgment. [Citation.]" (*In re Daniel G.* (2004) 120 Cal.App.4th 824, 830.) Simply put, the appellate court does not reweigh the credibility of the witnesses. (*Johnson v. Pratt & Whitney Canada, Inc.* (1994) 28 Cal.App.4th 613, 622.)

*B. Breach of Fiduciary Duty:*

The court found that Joan did not breach her fiduciary duty when she executed the declaration of trust split on November 29, 2010. It reasoned that the trust split was moot inasmuch as it was properly retracted, there was insufficient evidence of damage resulting from the retracted trust split, the terms of the trust relieved the trustee of liability for all but gross negligence or willful misconduct, and the evidence did not support the claim that Joan either had committed gross negligence or had engaged in willful misconduct.

Appellants claim the court erred in holding that Joan did not breach her fiduciary duty when she executed the November 29, 2010 declaration of trust split. In making this assertion, they rely on certain of Joan's trial testimony.

6

At trial in February 2013, Joan was asked to look at a copy of the November 29, 2010 declaration of trust split. When asked whether it looked familiar to her, she replied, "Vaguely." Then she was asked questions about the various schedules to the declaration. With respect to schedule A, pertaining to the survivor's trust, and in particular with reference to the listing of "Bank Account," Joan was asked "were you intending that to be a particular bank account?" Joan answered, "No." Then she was asked, "Were you intending it to encompass all the bank accounts?" She replied, "Yes. I guess." Joan was also asked, "Now when Bud passed away, isn't it true you had four bank accounts, another Wells Fargo Bank, right, you and Bud together?" Joan responded, "I thought we had two." However, on further questioning she recollected that there was one account at Bank of America and there were two accounts at Union Bank at the time Bud died.

When being questioned about schedule B, which pertained to exemption trust B1 and did not reference any bank accounts, Joan was asked, "And when you signed this schedule B, isn't it true that you did not intend for Lynn, George, and Michael to have any of the proceeds from the Wells Fargo accounts?" Joan answered, "Yes."

This last response is what appellants hang their hats on to say that Joan breached her fiduciary duty to them. They note that the Wells Fargo bank accounts had a collective value of more than $160,000 at the date of Bud's death. They cite section 4.3 of the Mahurin Family Trust which identifies the remainder beneficiaries of the community property portion of the trust who shall share the income and principal thereof after the death of both settlors: Valerie as to 50 percent and appellants collectively as to 50 percent. Given their identification as 50 percent beneficiaries, collectively, appellants claim that Joan's attempt to deprive them of half of the Wells Fargo bank accounts was "a step above gross negligence as a matter of law." We disagree.

There are several points appellants overlook. First, they completely ignore the fact that Joan appeared to have only a vague recollection of the particulars of the trust

7

split at the time she testified as to her intent with respect to schedule B. Second, they appear not to even consider the possibility that Joan may have intended an equal split that allocated the cash to one subtrust and other assets of an equal value to another subtrust. They cite no provision of the Mahurin Family Trust which requires that every asset must be divided into fractional shares and that one equal share of every asset must be allocated to each subtrust. They do not show that it would be improper, for example, to allocate a mix of properties to the various subtrusts as long as the total value of each subtrust was proper.

Third, they completely overlook the fact that the original trust split allocated to Joan's survivor's trust far less of the community property than she was entitled to. Section 5.21 of the Mahurin Family Trust provides that the survivor's trust shall be funded with the surviving spouse's half of the community property in the trust as well as any of her separate property in the trust. However, even assuming the original trust split is properly construed as allocating all of the Wells Fargo bank accounts to Joan's survivor's trust, the trust split shorted Joan.

Although schedule A to the original trust split does not give the values for the various assets listed thereon, the later-prepared inventory does. The Wells Fargo bank accounts, as appellants so frequently remind us, were worth about $160,000 at the time of Bud's death. The Bank of America account was worth about $115. The remaining items on schedule A included a nonoperational 1969 Rolls Royce worth about $5,999, two boats worth about $18,000 collectively, household furnishings valued at about $25,000, and jewelry. Joan's jewelry, claimed to be her separate property, was worth about $5,000. Thus, the original trust split allocated to Joan's survivor's trust property worth about $214,000 (including her jewelry) out of a community property estate exceeding $1.3 million in value, even though section 5.21 of the Mahurin Family Trust provides that her half of the community property and all of her separate property are to be allocated to the survivor's trust.

8

Fourth, appellants completely downplay the significance of the fact that an elderly woman in her 80's asked legal counsel to prepare the trust split, sought another legal opinion when the remainder beneficiaries objected, and retracted the original trust split and provided a revised one when she was advised that the original trust split was improper.

The only legal authority appellants cite is *Frittelli, Inc. v. 350 North Canon Drive, LP* (2011) 202 Cal.App.4th 35, a summary judgment case having to do with commercial leasing. (*Id.* at p. 39.) They cite just two sentences from that case: "To constitute gross negligence, misconduct must demonstrate 'either a """"want of even scant care""" or """"an extreme departure from the ordinary standard of conduct.""" [Citations.]' [Citation.] Although gross negligence usually presents a question of fact [citation], in some circumstances its existence can be resolved as a question of law [citation . . .]." (*Id.* at p. 52.) But here, appellants have not shown that Joan lacked "even scant care" or committed "an extreme departure from the ordinary standard of conduct" in relying on counsel to prepare a trust split and in executing a trust split that did not allocate a fractional share of each asset to each subtrust.

Moreover, appellants ignore the first sentence of the paragraph of *Frittelli, Inc. v. 350 North Canon Drive, LP*, *supra*, 202 Cal.App.4th 35, containing the above-referenced quote. That sentence provides: "Generally, '[g]ross negligence is pleaded by alleging the traditional elements of negligence: duty, breach, causation, and damages. [Citation.]" (*Id.* at p. 52.) Even assuming the evidence demonstrated that Joan had breached her duty to appellants as remainder beneficiaries, they have not shown how any such breach in the execution of the initial declaration of trust split caused them to suffer damage.

*C.  Trust Reformation:*

*(1)  Petition for instructions—*

Probate Code section 17200 permits the trustee of a trust to petition the court for instructions concerning the internal affairs of the trust.  (Prob. Code, § 17200, subds. (a),(b)(6).)  Pursuant to that statute, Joan requested that the court instruct her on two matters:  (1) the number of subtrusts into which the Mahurin Family Trust should be split; and (2) the payment to herself of the income and principal of the exemption trust.

*(2)  Trust split—*

In her petition, Joan observed that the Mahurin Family Trust required the property of the deceased settlor to be allocated to three subtrusts—exemption trust B1, exemption trust B2, and the marital trust.  The assets were to be allocated according to a formula based on federal estate tax laws in effect at the time of death.[2]

However, Joan explained that because Bud died in 2010 with property less than $1,000,000 in value, the estate tax laws at the time made allocation to three subtrusts unnecessary.  All of Bud's property—both his separate property and his share of the community property—could be allocated to one subtrust without estate tax ramifications.  She requested that the court instruct her to allocate all of Bud's property to exemption trust B1 and to disregard as superfluous exemption trust B2 and the marital trust described in the Mahurin Family Trust.

The court granted this request.  Appellants do not challenge this portion of Joan's request for instructions or the court's ruling on the point.  However, they take issue with her request for instructions on the payment of principal and income from

---

[2]     Section 5.22 of the Mahurin Family Trust states:  "The Exemption Trust (B1) shall consist of the deceased spouse's separate property and the deceased spouse's interest in the Settlors' community estate."  Section 5.23 provides:  "The Exemption Trust (B2) shall consist of a pecuniary amount equal to the maximum sum that can be allocated to a trust that does not qualify for the federal estate tax marital deduction to any extent, without producing any federal estate tax . . . ."  Finally, section 5.24 provides that the remainder of the trust estate, if any, shall be allocated to the marital trust.

exemption trust B1 and on the court's ruling thereon.  We turn to these matters now.

### (3)  Power to invade principal—

### (a) trust modification

Section 5.28 of the Mahurin Family Trust addresses the payment of income and principal from the exemption trusts and from the marital trust.[3]  It directs the trustee to pay all income from exemption trust B1 and exemption trust B2 to the surviving spouse.  It also permits the trustee to invade the principal of exemption trust B2 for the beneficiaries' health, education, support and maintenance.  Finally, it allows the trustee to invade the principal of "the Exemption Trust or the Marital Trust without exhausting the Survivor's Trust if the Trustee considers it advisable."  However, section 5.28 says nothing about what should happen if the tax laws in effect at the time of death were such that all property was allocated to exemption trust B1 and none allocated to either exemption trust B2 or the marital trust.

In its judgment, the court ordered that the provision be construed to read as follows:  "On the Deceased Spouse's death, the Trustee shall pay to or apply for the benefit of the Surviving Spouse all of the net income of the Exemption Trust . . . .  If the Trustee determines that the payment of income shall be insufficient, the Trustee may pay to or apply for the benefit of the Surviving Spouse such amounts of principal for her

---

[3]      Section 5.28 of the Mahurin Family Trust provides:  "On the deceased spouse's death, the Trustee shall pay to or apply for the benefit of the surviving spouse from the net income and principal of the Exemption Trust all income from the Exemption Trusts B1 and B2.  [¶] If the Trustee considers the income insufficient, the Trustee shall also pay to or apply for the benefit of the surviving spouse all sums from principal of Trust B2 as the Trustee, in the Trustee's discretion, considers necessary for the beneficiaries' respective proper health, education, support, and maintenance.  [¶] Payments from principal to the surviving spouse shall be made first from the Survivor's Trust until it is exhausted, then from the Marital Trust until it is exhausted, and thereafter from the Exemption Trust B2, except that all or any part of those payments may be made from the Exemption Trust or the Marital Trust without exhausting the Survivor's Trust if the Trustee considers it advisable."

11

health, education, support and maintenance, taking into account other income or resources available to the Surviving Spouse; provided however, that the Trustee is not required to exhaust the principal of the Survivor's Trust prior to making such payment."

In so ordering, the court observed that when Bud died in 2010, there was no federal estate tax. It also found "that the primary intent of the [Mahurin Family] Trust is to provide for the settlors during their lifetime, especially given the length of this marriage, some 40 years."

*(b) authority for relief*

Appellants argue that Joan's petition was not really a request for instructions, to be governed by Probate Code section 17200, but was in actuality a request for reformation and modification of an irrevocable trust, to be governed by Probate Code section 15403. That statute provides that, subject to certain limitations, "if all beneficiaries of an irrevocable trust consent, they may compel modification or termination of the trust upon petition to the court." (Prob. Code, § 15403, subd. (a).) However, as appellants point out, they as beneficiaries did not consent to the modification of the Mahurin Family Trust.

Even so, the suggestion that Joan erred in bringing a Probate Code section 17200 petition or the court erred in acting on it without beneficiary consent is contrary to case law. In *Ike v. Doolittle* (1998) 61 Cal.App.4th 51, the court stated that Probate Code section 15400 et seq. was not the only source of authority for trial court modification of a trust. It noted that Probate Code section 17200 permits the trustee "to 'petition the court . . . concerning the internal affairs of the trust . . . .'" (*Ike v. Doolittle*, *supra*, 61 Cal.App.4th at p. 84.) It also observed that section 17200, subdivision (b)(13) authorizes a trustee to seek a court order modifying the trust. (*Ike v. Doolittle*, *supra*, 61 Cal.App.4th at p. 84.) Consequently, there was no impropriety in Joan's requesting that the court instruct her with respect to the handling of the Mahurin Family Trust, including

12

the payment of income and principal, especially given the effect of the federal estate tax laws in effect at the time of the trust split.

Appellants also say that absent compliance with Probate Code section 15403, the only other way to obtain the relief Joan sought was to seek reformation of the Mahurin Family Trust by presenting clear and convincing proof that settlor intent was other than that stated in the Mahurin Family Trust. In support of this position, they cite only one case—*Campbell v. Republic Indemnity Co.* (1957) 149 Cal.App.2d 476, having to do with the reformation of an automobile insurance policy. (*Id.* at pp. 477-478.)

In *Campbell v. Republic Indemnity Co., supra,* 149 Cal.App.2d 476, the court observed: "Reformation is a remedy accorded to an aggrieved party to a written contract when, through fraud or mistake . . . , the contract does not truly express [the parties'] intention. . . . The court is not limited to inquiring what the language of the contract was intended to be, but may inquire what the contract was intended to mean. [Citation.] Although the party seeking revision of the contract must present clear and convincing proof, the intention of the parties is a factual matter to be determined by the trial court, and our review of the judgment is limited to the question whether it is supported by substantial evidence." (*Id.* at pp. 479-480.)

Were we to construe Joan's petition as a request for reformation, rather than a request for instructions, and to apply the rule expressed in *Campbell v. Republic Indemnity Co.*, *supra*, 149 Cal.App.2d 476, we would ask whether substantial evidence supports an implied finding that Joan presented clear and convincing proof that she and Bud as settlors intended for the Mahurin Family Trust to be construed in the manner the court construed it. (*Virtanen v. O'Connell* (2006) 140 Cal.App.4th 688, 709 [we imply findings to support the judgment].)

*(c) written evidence of settlor intent*

Appellants cite four items to show that the evidence did not support the court's construction. First, they cite section 5.28 of the Mahurin Family Trust. That

13

provision, as we have already discussed, fails to address the situation where neither exemption trust B2 nor the marital trust is ever funded, due to the state of the federal estate tax laws on the date of death. Consequently, it is of little assistance in demonstrating the intent of the settlors given the state of the federal estate tax laws on the date of death.

Second, appellants cite section 5.22 of the Mahurin Family Trust, which provides simply: "The Exemption Trust (B1) shall consist of the deceased spouse's separate property and the deceased spouse's interest in the Settlor's community estate." Read in isolation, section 5.22 would dictate that all of Bud's property would be placed in exemption trust B1 on his death and there would be no other subtrusts. Yet other provisions require the creation of exemption trust B2 and the marital trust. At a minimum, section 5.22 indicates that the intention was for the Mahurin Family Trust estate to be divided and for the deceased spouse's separate property and share of community property to go into a subtrust other than the survivor's trust. However, the provision affords little insight with respect to the issues before us.

Third, appellants cite section 4.3 of the Mahurin Family Trust. That is the provision identifying the remainder beneficiaries designated to share in the community property portion of the Mahurin Family Trust "after the death of both Settlors." It provides that Valerie shall take 50 percent and appellants collectively shall take the other 50 percent. That section is inconsistent with other Mahurin Family Trust provisions to the extent that it can be construed as meaning that the community property remaining on hand after the second death should then be divided 50/50. Section 5.20, in contrast, states the property is to be divided after the first death, not the second.

In any event, appellants' argument is that the Mahurin Family Trust provisions show Bud intended for them to have the principal of his estate and further intended that Joan not have the power to invade the principal of his share. The problem, as we have indicated, is that the Mahurin Family Trust terms are ambiguous on various

14

points, notably what happens with respect to the payment of income and principal during Joan's life when she is the survivor and the estate tax laws in effect at the time of Bud's death are such that the creation and funding of exemption trust B2 and the marital trust are unnecessary.

*(d) testimony*

Fourth and finally, appellants cite a portion of the testimony of Joan's expert witness, Attorney John Deily. Appellants state: "JOAN's Own Expert, Mr. Deily agreed once you fund the SubTrusts, namely the Survivor's Trust and Exemption Trust B-1, the issue of need for Support, Maintenance and Health never arises. [Record reference.] It was therefore improper and a gratuitous act by the Trial Court to Reform the Irrevocable Exemption Trust B-1 so JOAN can tap and spend Principal."

Appellants fail to prove their point. In the cited exchange, appellants' counsel asked Attorney Deily: "If . . . only the subtrusts—the survivor's trust and the exemption B1 trust are funded, would you agree then that the analysis in connection with . . . [the] need for support, education, maintenance, and health never arises?" Attorney Deily responded: "That's correct. I would agree with you."

Appellants cite this exchange without explanation or analysis. However, we note that in another portion of the reporter's transcript, appellants' counsel and Attorney Deily each allude to the fact that the words of the Mahurin Family Trust pertaining to an invasion of the principal as "necessary for the beneficiaries' respective proper health, education, support, and maintenance" have to do with what they refer to as "Treasury Regulation 2041."

As a matter appellants do not discuss, we note that title 26 United States Code section 2041 generally provides that property shall be included in the value of the gross estate of a decedent who had a power of appointment over the property exercisable in favor of himself or herself. (26 U.S.C. § 2041(a)(2),(b).) However, the statute also provides that "[a] power to consume, invade, or appropriate property for the benefit of the

15

decedent which is limited by an ascertainable standard relating to the health, education, support, or maintenance of the decedent shall not be deemed a general power of appointment." (26 U.S.C. § 2041(b)(1)(A).) It appears that the tax provisions of the Mahurin Family Trust included language about the invasion of principal as "necessary for the beneficiaries' respective proper health, education, support, and maintenance" in order to reduce the likelihood that the principal of the deceased spouse's subtrusts would be included in the gross estate of the surviving spouse on her subsequent death, for federal estate tax purposes.

In any event, appellants do not explain how Attorney Deily's response to their counsel's question about the title 26 United States Code section 2041 language meant that Attorney Deily agreed it was improper for the trial court to construe the Mahurin Family Trust so as to enable Joan to invade the principal of exemption trust B1 on the terms the court specified. To the contrary, other portions of Attorney Deily's testimony belie that suggestion.

Although appellants' counsel tried to get Attorney Deily to concede that it was below the standard of care to file a petition requesting permission for the trustee to invade the principal of exemption trust B1, Attorney Deily would not concede the point. He repeatedly opined that the terms of the Mahurin Family Trust were "contradictory and confusing," and that it was not a violation of the standard of care to petition the court for instructions when the Mahurin Family Trust terms were unclear and the trustee was uncertain how to proceed.

Appellants' counsel asked Attorney Deily: "[S]ection 4.3 [of the Mahurin Family Trust] provides that 50 percent of all the community property is to go to Lynn, George, and Michael. And my question to you is, would it not be below the standard of care for a trustee to seek to diminish that 50 percent by . . . filing a petition to modify the trust to invade the principal in this case, B1?" Attorney Deily responded in the negative, explaining: "It is not gross negligence or [a] violation of the standard of care of this

16

particular trust to file a petition that seeks an interpretation that may benefit one beneficiary over another if you're not sure what it is. . . . I believe it would be . . . self-dealing if you didn't, in fact, do that. Just because somebody is a trustee and also a beneficiary, they don't have to forget about their beneficial interest. So if they bring it to the court, they lay it out and give notice to everybody that's impacted by it, I do not believe that that would be below the standard of care for this trust."

Appellants' counsel continued to press the point, by asking Attorney Deily: "But would that not in this instance, in looking at [section] 4.3, be contradictory to the intent of the settlors to provide 50 percent of the community [property] to Lynn, George, and Michael?" Attorney Deily responded: "You know, again, the intent of the settlors is always relevant, and there may be certain intent arguments that when you have an older trust drafted many years ago when interest rates and what is generated on principal is 5 or 6 percent, and now when it's operative it may only be generating 1 percent, that would be perhaps inconsistent and grounds for coming in and seeking a modification because trustor would have wanted to provide for his surviving spouse to have a reasonable income stream."

As the foregoing shows, Attorney Deily suggested that the settlors intended for the surviving spouse to have a reasonable income and that the provisions with respect to invasion of principal were drafted at a time when interest rates were considerably higher than when Bud died. He further suggested, impliedly, that it was unlikely the settlors foresaw the possibility that the income stream upon trust split would be so much lower as to prompt a need or desire to invade principal.

We observe that appellants do not cite any testimony or evidence of Joan on the topic of intent, or even mention whether she testified or provided evidence on the topic. They also do not cite any of the testimony of their own expert witness, Attorney Harry Westover on the point. We have taken the time on our own to discover that Attorney Westover agreed "the language in the [Mahurin Family] Trust referring to B1

17

and B2 [was] very poorly drafted" and "confusing." However, we have not taken the time to review all his testimony to see what, if anything, he had to say either about the intent of the settlors, with respect to income stream or invasion of principal, as may be gleaned from the terms of the Mahurin Family Trust, or about the court's construction of the Mahurin Family Trust as consistent with that intent. It is not our obligation to do so. (*Del Real v. City of Riverside* (2002) 95 Cal.App.4th 761, 768.)

It is appellants' burden to show error (*Virtanen v. O'Connell*, *supra*, 140 Cal.App.4th at p. 710), and they have failed to do so. "'It is well established that a reviewing court starts with the presumption that the record contains evidence to sustain every finding of fact.' [Citations.] [Appellants'] contention herein 'requires [appellants] to demonstrate that there is *no* substantial evidence to support the challenged findings.' (Italics added.) [Citations.] A recitation of only [appellants'] evidence is not the 'demonstration' contemplated under the above rule. [Citation.] Accordingly, if, as [appellants] here contend, 'some particular issue of fact is not sustained, they are required to set forth in their brief *all* the material evidence on the point and *not merely their own evidence.* Unless this is done the error is deemed to be waived.' (Italics added.) [Citations.]" (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881; accord, *Myers v. Trendwest Resorts, Inc.* (2009) 178 Cal.App.4th 735, 749.)

D. *Examination of Valerie:*

(1) *Background—*

Appellants claim the court erred in precluding their direct examination of Valerie and permitting only their cross-examination of her, limited to the scope of Joan's direct examination. Certain background information is required to understand their point.

At the end of the first day of trial, on February 11, 2013, the court asked appellants' counsel about the witnesses he intended to call on February 13. After identifying several other witnesses he intended to call, appellants' counsel added: "And I

18

. . . need to call Valerie Miller. I mean, she's outside.[4] If I need to serve her with a trial subpoena tonight or tomorrow, I'll do it. Doesn't make sense to me. I'll do it." The court asked: "Is she going to be here, voluntarily testify?" Joan's counsel stated: "Not on [appellants'] side. Not on [their] case." The court then said: "You're not gonna provide her. I know she's not your client. I wouldn't want somebody coming on my door with a subpoena. Why don't you guys work that out." Joan's counsel replied: "We can work that out, I'm sure." Appellants' counsel made no further comments on the topic before the court. The record provides no indication whether the attorneys ever had any subsequent communication on the matter or made any effort to work something out.

At one point, on February 13, the court asked appellants' counsel if he intended to call any more witnesses. Appellants' counsel replied: "I was also going to call Valerie Miller, and I understood that counsel was going to produce her. We were gonna work that out, I believe she mentioned on Monday. I have some questions for her." Joan's counsel said: "She's gonna be my witness. He didn't subpoena her; he can't call her."

Appellants' counsel thereafter stated: "Well, let me say for the record, I understood on Monday that issue was gonna be worked out; thus it wouldn't be necessary to have a trial subpoena served on the witness over the holiday, and so, you know, having heard that, we'll work it out, now I'm hearing go pound sand. That's disconcerting." However, appellants' counsel offered no information on whether he had contacted Joan's counsel about the witness.

The court stated that if it were established that Valerie was affiliated with a party, she could be called under Evidence Code section 776. It also stated that, were that not established, appellants' counsel could cross-examine Valerie within the scope of the direct examination.

---

4 The court had granted an Evidence Code section 777 motion in limine to exclude from the courtroom nonparty witnesses while not testifying.

Ultimately, Joan called Valerie as a witness. The court sustained the objections of Joan's counsel when, on cross-examination, appellants' counsel endeavored to ask questions beyond the scope of direct examination.

*(2) Discussion—*

Appellants rely on Code of Civil Procedure section 1990, which provides: "A person present in Court . . . may be required to testify in the same manner as if he were in attendance upon a subpoena issued by such Court . . . ." They say *People v. Simon* (1951) 107 Cal.App.2d 105 shows the court should have applied section 1990 to allow them to conduct a direct examination of Valerie.

In *People v. Simon*, *supra*, 107 Cal.App.2d 105, a defendant in propria persona requested that the court subpoena an out-of-state witness, but the court declined. However, the witness appeared on behalf of the People as plaintiffs. (*Id.* at pp. 118, 121.) The appellate court held that, given Code of Civil Procedure section 1990, it was error to restrict the defendant's examination of the witness to cross-examination. However, it also held that the defendant had failed to demonstrate the error was prejudicial error requiring reversal. (*Id.* at p. 122.)

In the case before us, appellants likewise fail to show prejudicial error, a standard that applies in civil cases as well as criminal cases. (*Conservatorship of Maria B.* (2013) 218 Cal.App.4th 514, 532.) Appellants mention only one point they would have liked to pursue in their examination of Valerie, as we shall discuss.

On direct examination, Valerie was asked about schedule A to the original trust split. Schedule A itemized all of the property being allocated to the survivor's trust. The schedule listed six items. The second item read, "Bank Account." Joan's counsel asked: "Do you remember seeing another version of this schedule where 'bank accounts' was plural?" Valerie answered, "Yes."

On cross-examination, appellants' counsel asked Valerie, ". . . and you testified that you saw a schedule that said 'bank accounts,' plural?" Valerie responded,

20

"Yes." He then asked her when the last time was that she had seen that version of the schedule and where she had seen it. Valerie said the last time she had seen it was that afternoon, "[i]n [her] mother's book at home."

Appellants' counsel then asked Valerie: "What is in your mother's book at home?" Joan's counsel objected: "Outside the scope. Calls for speculation. Hearsay." The court said simply: "Sustained."

On appeal, appellants do not claim the court erred in sustaining the objections. Rather, they say they were prejudiced in not having an opportunity to conduct a broader examination of Valerie who testified about what they characterized as "a Key Document that was never produced in Discovery." However, appellants cite no portion of the record to show either what discovery was conducted or that Joan failed to produce a document she should have produced.

All we have is a line of questioning about a different version of schedule A to the original trust split. The disclosure that there was a version of schedule A referencing "bank accounts" in the plural, provides no more insight than we had already. There is no dispute that there were multiple community property bank accounts in existence on the date of Bud's death. Assuming the intention under the version of schedule A referencing "bank accounts" was for Joan to allocate every single community property bank account to the survivor's trust, it is of no consequence. Joan retracted that trust split on the advice of her second attorney when she learned that her first attorney had prepared a defective trust split. We have already stated that Joan did not breach her fiduciary duty to appellants by providing a trust split which she withdrew when she learned it was defective.

Furthermore, as we have observed already, the original trust split, which appellants believed to be so unfair that they sued Joan over it, actually allocated far less property to Joan's survivor's trust than she was entitled to. This is true even if schedule

21

A is interpreted to mean that every single community property bank account is allocated to that subtrust.

Anyway, the long and the short of it is that appellants have not demonstrated how they were prejudiced by the court's failure to permit them to conduct a direct examination of Valerie. Consequently, they have not demonstrated reversible error. (*People v. Simon*, *supra*, 107 Cal.App.2d at p. 122; *Conservatorship of Maria B.*, *supra*, 218 Cal.App.4th at pp. 532-533.)

E. *Deposition Subpoenas:*

*(1) Background—*

As noted above, appellants issued deposition subpoenas to Union Bank with respect to two accounts—one checking account and one money market account. They sought bank records from January 1, 2005 to January 1, 2011.

In her motion to quash, Joan argued that the deposition subpoenas were overbroad and sought irrelevant information in that they requested documents for a six-year period during which the Mahurin Family Trust was revocable. She also asserted that the accounts in question were her separate property, held in her name alone, and that the deposition subpoenas invaded her right to privacy. Joan requested that the court quash the deposition subpoenas, or in the alternative, issue a protective order.

Attached to Joan's motion was her own declaration, wherein she stated that she and Bud were married in May 1970. She also said that her mother died in 1972 and left her some money, some stock and certain real property in Alhambra. Joan further declared that her inheritance was always maintained as her separate property and that she never transmuted any of it to community property. She said that her separate property on hand was the Alhambra property and the two Union Bank accounts.

The court ordered Union Bank to comply with the deposition subpoenas, limited to a records period of May 11, 2009 to January 1, 2011—that is, for a period

22

beginning one year before Bud's death and ending about seven and a half months thereafter. It also ruled that the documents produced would be subject to a protective order, on terms Joan had proposed.

Appellants argue that the issuance of the protective order and the limitation on the period of production constituted prejudicial error.

*(2) Protective order—*

The protective order provides that confidential materials containing sensitive financial information may be marked "'ATTORNEYS' AND EXPERTS' EYES ONLY.'" It also states: "Access to materials designated 'ATTORNEYS AND EXPERTS' EYES ONLY' shall be limited to counsel of record for named parties, their legal associates, experts, and regularly employed office staffs only, but shall not in any way, including the contents thereof, be disclosed to parties without further order of this Court."

Appellants contend this language prejudiced them because it forbid their attorney from disclosing the contents of the Union Bank records to them without further court order, thereby "hamper[ing] effective representation on a central issue in the case." However, appellants do not explain in what way representation was hampered. Their attorney and their CPA had access to the records and so were able to analyze them on their behalves. If there was a reason why either their attorney or their CPA needed to disclose the contents of the records to them in order to perform an analysis or to properly represent them, appellants could have explained the situation to the court and sought permission to disclose the contents of the records.

None of the cases appellants cite having to do with discovery orders either addresses a protective order similar to the one before us or indicates that the court erred in imposing the order it did. (See *Valley Bank of Nevada v. Superior Court* (1975) 15 Cal.3d 652; *Forthmann v. Boyer* (2002) 97 Cal.App.4th 977; and *Rawnsley v. Superior Court* (1986) 183 Cal.App.3d 86.) It is appellants' burden to demonstrate error and to

23

cite legal authorities in support of their position. (*Conservatorship of Maria B., supra,* 218 Cal.App.4th at pp. 532-533 [appellant's burden to show miscarriage of justice]; *Virtanen v. O'Connell, supra,* 140 Cal.App.4th at p. 710 [appellant's burden to show reversible error]; (*Roden v. AmerisourceBergen Corporation* (2010) 186 Cal.App.4th 620, 648-649 [argument unsupported by citation to legal authority waived].)  They have done neither.

*(3) Period of production—*

Appellants also argue the protective order was sufficient to protect Joan's privacy interests, so there was no reason to limit the period of production.  They say they discussed the applicable legal criteria for the consideration of privacy objections in their opposition papers at pages 238 through 332 of the clerk's transcript.  While this citation to the record might seem to be a simple method of circumventing page limitations on appeal, it doesn't fly.  "An appellant cannot rely on incorporation of trial court papers, but must tender arguments *in the appellate briefs.*  [Citation.]" (*Paterno v. State of California* (1999) 74 Cal.App.4th 68, 109; accord, *Banning v. Newdow* (2004) 119 Cal.App.4th 438, 455.)  "We therefore disregard these purported incorporations by reference." (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 294, fn. 20.) In short, we will review only the authorities appellants cite in their appellate briefs and will not perform what is essentially an unassisted review of vast expanses of the record to find arguments and authorities on appellants' behalves. (*Niko v. Foreman* (2006) 144 Cal.App.4th 344, 368.)

*Valley Bank of Nevada v. Superior Court, supra,* 15 Cal.3d 652, which appellants cite, observes that a court must engage "in a careful balancing of the right of civil litigants to discover relevant facts, on the one hand, with the right of bank customers to maintain reasonable privacy regarding their financial affairs, on the other." (*Id.* at p. 657.)  The case further notes that a court needs to strike a balance between the competing considerations and that it is vested with discretion in doing so. (*Id.* at p. 658.)  It

articulates the following factors to be considered in the exercise of discretion: "'. . . the purpose of the information sought, the effect that disclosure will have on the parties and on the trial, the nature of the objections urged by the party resisting disclosure, and ability of the court to make an alternative order which may grant partial disclosure, disclosure in another form, or disclosure only in the event that the party seeking the information undertakes certain specified burdens which appear just under the circumstances.' [Citation.]" (*Ibid.*) Focusing only on the last factor, appellants say, as noted previously, that the protective order was enough and the limitation on the period of production was prejudicial error. They have not demonstrated this to be the case, for reasons we shall show.

### (a) testimony

### (i) of Joan and Valerie

At trial, Joan testified that she inherited the Alhambra duplex, some stock and some cash from her mother. Joan could not remember the amount of cash she inherited. However, she thought it was probably less than $25,000 and maybe even less than $10,000. She did not remember what she did with the money, except that she guessed she put it in the bank.

Valerie, in her testimony, corroborated that Joan had inherited stock from her mother. Valerie said that she herself had inherited shares of the same stocks and she identified some of them by name.

Joan opened the Union Bank account ending in numbers 2711 in 1975 (2711 Account), after she closed her mother's bank account. Joan was the signatory shown on the signature card. Joan testified that, on advice of her banker, she opened the Union Bank account ending in numbers 8892 in 1992 (8892 Account). Again, Joan alone was the signatory.

Joan testified that she deposited the rents from the Alhambra duplex into the Union Bank account she opened in 1975 and she paid the expenses for the Alhambra

25

duplex out of the same account. She further testified that she always kept the books for the Alhambra duplex separate from the books for the Newport Beach property. She said she did not write checks for the Alhambra duplex expenses off of any of the Wells Fargo or Bank of America accounts she held together with Bud.

Valerie testified that she had been assisting her mother with banking for about four years, at the time of trial. She said she had been writing the checks for Joan because her arthritis had gotten severe and it was hard for her to write checks herself. Valerie explained that Joan would set out the checkbooks and the invoices and "tell [her] which invoice to pay out of which checkbook."

Valerie also testified as to her understanding that the two Union Bank accounts belonged to Joan. She further testified as to her belief that Bud was aware of Joan's Union Bank accounts. She said she believed Bud knew about the accounts because she had overheard conversations between Bud and Joan.

*(ii) of George Lesley*

CPA George Lesley testified that he was hired to analyze the source of the deposits to and disbursements from the two Union Bank accounts and to perform tracing. He received bank statements, as well as check and deposit images, for the Union Bank 2711 Account and 8892 Account. He also received "tax organizers" covering the period of 2001 through 2010, except for 2005. He did not receive copies of Bud and Joan's tax returns. Lesley also reviewed certain documentation pertaining to Wells Fargo Bank accounts, but the scope of that documentation is unclear from the record.

Based on information he saw in the tax organizers, it appeared to Lesley that there was a negative cash flow from the Alhambra duplex from 2001 through 2010. The report he prepared reflected that there were substantial repairs in those years. Lesley opined that, given the negative cash flow in those years, the Union Bank accounts could not have been growing based on income from the duplex. However, Lesley acknowledged that the rental amounts actually deposited did not necessarily correspond

26

with the amounts reflected on the tax organizers and that, in 2010, for example, $20,150 in rents was deposited but only $8,400 in rents was reflected on the tax organizer. He also acknowledged that he did not know whether rents were collected in the form of checks or cash.

Lesley testified that he would have preferred to have received bank statements much further back in time than what was provided because he was unable to determine the source of the funds into the Union Bank accounts before May 2009. Indeed, he had no opinion as to the characterization of the 2711 Account prior to 2009.

### (iii) significance

In light of the foregoing testimony, appellants do not explain how any information that might have been contained in the Union Bank records from 2005 forward could have excluded the possibility that the Alhambra duplex was operated profitably from 1972 through 2004, when it was newer and may have required fewer repairs, and that rents from the duplex provided all or a substantial portion of the sums in those accounts. They also do not explain how such bank records could have excluded the possibility that Joan had indeed received from her mother's estate cash and/or stock that accounted for a portion of the sums in those accounts. Finally, they do not explain how such bank records could have excluded the possibility that any community property contributions to the Union Bank accounts over the years were gifts. Appellants engage in pure speculation to argue that Joan's bank records from 2005 forward would have provided evidence to dispel the separate property characterization. They disagree, pointing to evidence of commingling and evidence of title.

### (b) evidence of commingling

Appellants explain that had they received additional bank records, they may have been able to show a commingling of community property and separate property funds. They contend that even the limited records produced showed commingling.

27

Appellants emphasize that on November 1, 2009, Joan signed a check in the amount of $713.47, payable to "LA County Tax," and drawn on a Wells Fargo bank account. Joan acknowledged that the payment was made with respect to the Alhambra duplex, although she did not remember why it was drawn on the Wells Fargo account, inasmuch as she maintained that she never paid any expenses of the Alhambra duplex from any account other than the Union Bank accounts. Valerie, however, testified that she wrote out the check and her mother signed it. Valerie further testified that the check was drawn on the Wells Fargo account because she had "made a mistake." Valerie explained that she had picked up the wrong checkbook.

So, as evidence of "commingling" in the year before Bud died, appellants point to the tax check Valerie said she mistakenly wrote on the wrong account—a Wells Fargo account instead of Joan's Union Bank account. This check may be construed either as evidence of an error on the part of Valerie and/or Joan or as evidence that, contrary to Joan's assertion, she did not pay all Alhambra duplex expenses with funds from the Union Bank accounts. Either way, the evidence does not show that community funds were deposited into the Union Bank accounts before Bud's death.[5]

As further evidence of commingling, appellants point to two checks deposited into the Union Bank 2711 Account after Bud's death. The first was a check in the amount of $31,091.78, deposited in August 2010. The check was a United States Treasury check dated August 20, 2010, payable to Joan. Joan testified that the check was paid with respect to Bud's retirement. According to Valerie, she and Joan made inquiries with respect to the $31,091.78 check after it was received. She said they learned that it

---

[5]     If appellants intended to argue that the community should have been reimbursed for the amount of the check, they should have cited legal authorities in support of that position, but they did not. The argument is waived. (*Roden v. AmerisourceBergen Corporation*, *supra*, 186 Cal.App.4th at p. 648; *Paterno v. State of California*, *supra*, 74 Cal.App.4th at p. 106.)

28

represented the proceeds of "an annuity from Bud passing away with [Joan] as beneficiary."

Appellants also note that Joan deposited into the 2711 Account a check in the amount of $104.66, drawn on a Bank of America community property account. That check was dated June 25, 2010, executed by Joan and payable to herself, and bore the notation "close account."

So, as evidence of commingling in the seven and a half months after Bud died, appellants draw attention to the $31,091.78 annuity payment made to Joan in August 2010 and the $104.66 remainder of a Bank of America community property account on closeout. Query whether these two postdeath deposits in resolution of Bud's final affairs have much probative value to show that Joan commingled community and separate property monies in the Union Bank accounts in the decades before Bud's death.[6]

*(c) evidence of title*

Appellants contend Joan admitted at trial that the Union Bank accounts were Mahurin Family Trust accounts. We disagree with this characterization of her testimony.

Joan was asked to look at the signature cards for the two accounts, opened in 1975 and 1992. She was asked whether the signature on each card was hers. She replied, "Yes." She was then asked, "Was Bud ever on either of these accounts?" She replied, "No." Joan was then queried, "Did you put these accounts in your trust?" She replied, "Yes." Immediately thereafter she was asked, "You never changed title on the accounts, correct?" Joan said that was correct.

_____

[6]     Again, if appellants intended to assert that the community should have been reimbursed for these monies, they should have provided argument and citation to legal authority in support of that position, but they did not. The argument is waived. (*Roden v. AmerisourceBergen Corporation*, *supra*, 186 Cal.App.4th at p. 648; *Paterno v. State of California*, *supra*, 74 Cal.App.4th at p. 106.)

Clearly, the last two answers are inconsistent. If Joan never changed title to the two accounts, then the accounts were always in her name alone, not in the name of the Mahurin Family Trust. But even if Joan had placed the Union Bank accounts in trust, this would not have shown that they were no longer her separate property. Section 3.3 of the Mahurin Family Trust states that all separate property transferred into trust shall remain separate property.

Actually, in arguing that the court should have permitted them to obtain Union Bank records for the time period they desired, appellants simply say they needed them for tracing purposes. They do not suggest that the records would have shown title was held in the name of the Mahurin Family Trust during that period of time.

Indeed, the court found that the Union Bank accounts were Joan's separate property. In so finding, the court cited cases having to do with the significance of the manner of holding title to property: *In re Marriage of Lucas* (1980) 27 Cal.3d 808, 817-818 [superseded by statute on another point, as observed in *In re Marriage of Walrath* (1998) 17 Cal.4th 907, 914]; *In re Marriage of Fossum* (2011) 192 Cal.App.4th 336, 344; and *In re Marriage of Brooks & Robinson* (2008) 169 Cal.App.4th 176, 184-185. As observed in *In re Marriage of Fossum*, *supra*, 192 Cal.App.4th 336, Evidence Code section 662 "states, 'The owner of the legal title to property is presumed to be the owner of the full beneficial title. This presumption may be rebutted only by clear and convincing proof.'" (*In re Marriage of Fossum*, *supra,* 192 Cal.App.4th at p. 344.) Appellants do not address the court's finding, its citations or the presumption.

To simply argue in a vacuum that they should have had more bank records for tracing purposes, is to fail to demonstrate prejudicial error, where appellants have not shown what difference the tracing could have made given the title to the accounts and the presumption regarding the holding of title. Appellants do not argue that, if only they had received Union Bank records from 2005 forward, they could have shown by clear and convincing proof that the bank accounts were community property, notwithstanding the

30

fact that Joan had inherited substantial separate property in the early 1970's, opened the first Union Bank account in her name in the 1970's, and deposited the rents from the Alhambra duplex into those accounts over a period of decades before 2005.

To the contrary, appellants merely argue the court committed prejudicial error because there was "*certainly a chance* of having reached a More Favorable Outcome had the" court not limited the records production. (Italics added.) This is not the standard by which we determine prejudicial error.

"California's Constitution provides, 'No judgment shall be set aside, . . . in any cause, . . . for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice.' [Citations.] [¶] '"The effect of this [constitutional] provision is to eliminate any presumption of injury from error, and to require that the appellate court examine the evidence to determine whether the error did in fact prejudice the [appellant]. . . ." [Citation.] [¶] The phrase "miscarriage of justice" has a settled meaning in our law . . . . Thus, "a 'miscarriage of justice' should be declared only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is *reasonably probable* that a result more favorable to the appealing party would have been reached in the absence of the error." [Citation.]'" (*Conservatorship of Maria B.*, *supra*, 218 Cal.App.4th at p. 532, italics added.) "[T]he appellant bears the burden to make an 'affirmative showing' the trial court committed error and that error resulted in a miscarriage of justice. [Citations.]" (*Id.* at pp. 532-533.) Appellants have not shown "it is reasonably probable that a result more favorable to" them would have been reached if only they had received the Union Bank records from 2005 forward. (*Id.* at p. 532.)

*F. Attorney Fees:*

Appellants claim, without citation to the record, that the court erred in permitting Joan to charge to the exemption trust half of the attorney fees she incurred in the litigation. We could stop here and say the argument is waived for failure to cite the record. (*Roden v. AmerisourceBergen Corporation*, *supra*, 186 Cal.App.4th at p. 634.) However, inasmuch as Joan provides the needed record references, we will address the issue.

At trial, Valerie testified that, in assisting Joan, she had been charging half of the litigation expenses to the exemption trust, pursuant to the instructions of Attorney Blied. The court held that charging half of the fees to the exemption trust was proper. Its decision was "based upon the testimony of the experts, Messrs. Deily and Westover, and the Trust provisions."

Appellants fail to address either the testimony of the expert witnesses on the topic or the provisions of the Mahurin Family Trust bearing upon the availability of attorney fees. However, they say that charging half of the fees to the exemption trust was improper because the litigation arose with respect to the original trust split, the retraction of the original trust split coupled with the concealment of the Union Bank accounts, and Joan's petition to reform the Mahurin Family Trust so that she could invade the principal of the exemption trust. Appellants say none of these things benefitted the Mahurin Family Trust and all of them benefitted Joan at the expense of themselves.

In support of their position, they cite only one authority—*Whittlesey v. Aiello* (2002) 104 Cal.App.4th 1221. In that case, the court denied an award of attorney fees to counsel for an individual who was both the trustee and a beneficiary and who defended litigation challenging a trust amendment that named her as the primary beneficiary. The plaintiff, a different beneficiary, succeeded in having that trust amendment declared invalid, with the result that she, the plaintiff, was restored as the primary beneficiary. (*Id.* at pp. 1228, 1230.) The court held that for the attorney fees of

32

the unsuccessful defendant to be charged to the trust would be, in effect, to require the prevailing party to finance the litigation of the losing party. (*Id.* at p. 1230.) But here, Joan, as trustee, was successful in her attempt to obtain clarification of the terms of the Mahurin Family Trust and appellants were unsuccessful in their attempt to show Joan had breached her fiduciary duty to them.

As stated in *Whittlesey v. Aiello*, *supra*, 104 Cal.App.4th 1221, "Allowance of litigation expenses rests in the sound discretion of the trial court, whose ruling will not be disturbed on appeal absent an abuse. [Citation.] 'The underlying principle which guides the court in allowing costs and attorneys' fees incidental to litigation out of a trust estate is that such litigation is a benefit and a service to the trust.' [Citation.] Consequently, where the trust is not benefited by litigation, or did not stand to be benefited if the trustee had succeeded, there is no basis for the recovery of expenses out of the trust assets." (*Id.* at p. 1230.)

Here, the litigation served to obtain a clarification of the terms of the Mahurin Family Trust, which the expert witnesses said were confusing, very poorly drafted and contradictory. The trial court impliedly found that this clarification benefitted the trust (*Virtanen v. O'Connell*, *supra*, 140 Cal.App.4th at p. 709 [we imply findings to support the judgment]) and we agree. The litigation also resulted in the correction of a faulty trust split, to the extent that the appellants' filing of their petition prompted Joan to obtain new counsel who opined that her prior counsel had erred in preparing the trust split. To the extent this result is characterized as a benefit only to appellants, and not to the Mahurin Family Trust, we do not know what portion of the fees was generated on account of this topic. (See *Graciano v. Robinson Ford Sales, Inc.* (2006) 144 Cal.App.4th 140, 157 [dilution of attorney fees not always required, where apportionment not feasible].) For that matter, we do not even know whether the attorney fees incurred with respect to the initial trust split and the retraction were among those fees charged 50 percent to the exemption trust.

33

Moreover, as *Whittlesey v. Aiello*, *supra*, 104 Cal.App.4th 1221 also provides: "'A trustee is entitled to the repayment out of trust property for the following: [¶] (a) Expenditures that were properly incurred in the administration of the trust. [¶] (b) To the extent that they benefited the trust, expenditures that were not properly incurred in the administration of the trust.' (Prob. Code, § 15684.) . . . '[W]here litigation is necessary for the preservation of the trust, it is both the right and duty of the trustee to employ counsel in the prosecution or defense thereof, and the trustee is entitled to reimbursement for his expenditures out of the trust fund.' [Citation.] 'If the trustee acts in good faith, he has the power to employ such assistants and to compensate such assistants out of the assets of the trust even though he may not ultimately succeed in establishing the position taken by him as such trustee.' [Citation.]" (*Whittlesey v. Aiello*, *supra*, 104 Cal.App.4th at pp. 1226-1227.)

Here, Joan as the surviving spouse and trustee, was responsible for accomplishing the trust split on Bud's death. It was proper for Joan, as trustee, to hire Attorney Kelsall to prepare the trust split, even though he appears not to have done a good job of it. It was also proper for her to consult a second attorney about the trust split when she was sued over the trust split prepared by the first attorney. When the second attorney, Attorney Blied, prepared both a retraction of the first trust split, and a second trust split together with an inventory, it was for the benefit of the Mahurin Family Trust. This is true even though the second trust split may also have benefitted appellants more than other beneficiaries. Anyway, these expenditures were "properly incurred in the administration of the trust," within the meaning of Probate Code section 15684. We cannot say that the court abused its discretion to the extent that some of the attorney fees incurred in connection with the initial or revised trust splits may have been charged under the umbrella of litigation expenses—a matter we do not know in any event. (Cf. *Graciano v. Robinson Ford Sales, Inc.*, *supra*, 144 Cal.App.4th at p. 157.)

It is appellants' burden to show error.  (*Virtanen v. O'Connell*, *supra*, 140 Cal.App.4th at p. 710.)  They have not met their burden.

As a final point, we note Joan requests that we authorize the trial court to entertain a further motion for attorney fees she intends to file on remand.  The trial court is so authorized.  (Prob. Code, § 15684.)

## III

## DISPOSITION

The judgment is affirmed.  Respondent shall recover her costs on appeal.


MOORE, J.

WE CONCUR:


O'LEARY, P. J.


IKOLA, J.

35